IN THE UNITED STATED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

EFFIE CAMPBELL SIEGLING          )
BOWERS by and through her        )
ATTORNEY-IN-FACT TERRELL         )
W. BOWERS,                       )          CASE NO. _4:15_ -CV- _11_ (CDL)
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )          **(Jury Trial Demanded)**
                                 )
BRANCH BANKING AND TRUST         )
COMPANY, Successor in merger to  )
BRANCH BANKING AND TRUST         )
COMPANY OF SC, and               )
STERLING CAPITAL                 )
MANAGEMENT, LLC, Successor in    )
merger to BB&T ASSET             )
MANAGEMENT LLC,                  )
                                 )
          Defendants,            )
_____ )

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Effie Campbell Siegling Bowers (Mrs. Bowers) by and through her Attorney-in-

Fact Terrell W. Bowers complains of Defendants as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Mrs. Bowers is a longtime citizen and resident of the County of Muscogee in the

State of Georgia.

2.    Mrs. Bowers' son, Terrell W. Bowers, is the duly qualified and acting Attorney-in-

Fact for his Mother and brings this action in that capacity, on her behalf, and for her benefit.

3.    Upon information and belief, Defendant Branch Banking and Trust Company

("BB&T Bank") is the successor in merger to Branch Banking and Trust Company of South

Carolina and is organized under the laws of the State of North Carolina with its principal place of

business in Winston-Salem, North Carolina. BB&T Bank is a citizen and resident of the State of North Carolina.

4.      Upon information and belief, BB&T Bank is the twelfth (12th) largest bank in the United States, with assets of over $182 Billion ($182,901,216,000.00), as of September 30, 2014.

5.      BB&T Bank's parent company is BB&T Corporation, a holding company that issues BB&T Corporation Stock which is traded on the New York Stock Exchange under the trading symbol "BBT." Upon information and belief, BB&T Corporation has assets of over $187 Billion ($187,000,000,000.00) as of September 30, 2014.

6.      The major asset of BB&T Corporation is BB&T Bank, which comprises approximately ninety-eight percent (98%) of BB&T Corporation's assets.

7.      Upon information and belief, Defendant Sterling Capital Management, LLC is the successor in merger of BB&T Asset Management LLC ("BB&T Asset Management")[1] and a registered investment advisor organized under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina. Sterling Capital Management, LLC is a citizen and resident of the State of North Carolina.

8.      Defendants BB&T Bank and BB&T Asset Management will hereinafter collectively be referred to as "BB&T."

9.      At all times relevant hereto, under agency law, common law principles of *respondeat superior*, and state securities laws, BB&T Bank and BB&T Asset Management are each jointly, severally, and fully accountable for, and totally liable for the actions, inactions, omissions and

---

[1]   BB&T Asset Management LLC is itself a successor in merger of BB&T Asset Management, Inc.

wrongdoing which were performed for and on behalf of Defendants, or any of them, by any of their agents, employees, servants and/or representatives.

10.     Upon information and belief, BB&T Bank and BB&T Asset Management are both registered to do business in Georgia. Defendants engage in continuous and systematic activities within the State of Georgia, including the use of the courts of this State to enforce contractual and other rights against citizens of Georgia.

11.     Defendants presently conduct business and, at all relevant times, conducted business and performed acts in Muscogee County, Georgia and have sufficient contacts and business within Muscogee County, Georgia so as to be subject to the *in personam* jurisdiction of this Court pursuant to the laws of Georgia.

12.     Venue is proper in the Middle District of Georgia because the most substantial parts of the acts and omissions giving rise to the causes of action in this Complaint occurred in Muscogee County, and Defendants have locations in and hold themselves out as doing business in Muscogee County.

## STATEMENT OF FACTS

13.     While Mrs. Bowers has never had the experience or training to fully understand investment products and strategies or the prudence and suitability of their use, over the last several years she has been experiencing a decline of mental acuity, memory and understanding such that she has become unable to manage the ordinary affairs of life, which required her to rely upon BB&T Bank for fiduciary services including investment advice about and management of her financial assets, all in keeping with the promises made and assurances given by BB&T Bank as it solicited the management of her financial assets and established itself as her trusted advisor and fiduciary, as is more fully described hereinafter.

3

14.     Effie (*nee* Campbell Siegling) Bowers was born in Charleston, South Carolina in 1921. As of the filing of this Complaint, Mrs. Bowers is ninety-three (93) years old.

15.     She married Lloyd G. Bowers, Jr., in 1946 and moved to his hometown of Columbus, Georgia.

16.     Their marriage produced six dearly beloved children.

17.     American Family Life Assurance Company of Columbus, the predecessor of the company now known as AFLAC Incorporated ("AFLAC"), was formed in or about 1955 in Columbus, Georgia. Mr. Bowers knew the company's founders and purchased shares in this hometown company early in its development.

18.     Over the years, Mr. Bowers' original investment in AFLAC grew as a result of the growth and appreciation in the value of the company, stock splits, and dividends.

19.     Mr. Bowers suffered a stroke in September 1983 and died in March 1994.

20.     In addition to AFLAC shares that Mrs. Bowers held in her own name, she inherited a large position in AFLAC stock from her husband, which continued to grow as a result of the growth and appreciation in the value of the company, additional stock splits, and dividends.

21.     On or about August 10, 1998, Mrs. Bowers created the Effie C.S. Bowers Irrevocable Insurance Trust ("Bowers Insurance Trust" or "Insurance Trust") to be a valuable and important part of her estate. Mrs. Bowers initially funded the Bowers Insurance Trust with a single, $6 million universal life insurance policy issued on May 20, 1998, by Transamerica Occidental Life Insurance Company. Over the years she faithfully paid premiums to maintain this and subsequent policies held by the Insurance Trust in full force and effect.

4

22.     In or around 2001, BB&T Bank became Trustee of the Bowers Insurance Trust, and thereby assumed all the obligations of a trusted fiduciary to the Bowers Insurance Trust and Mrs. Bowers.

23.     With full knowledge that Mrs. Bowers' financial assets were required to generate sufficient income to pay her living expenses, as well as premiums to maintain in full force and effect the insurance in the Bowers Insurance Trust, in or around the mid-2000's, BB&T Bank, as Trustee of the Bowers Insurance Trust, advised Mrs. Bowers to replace, and thereafter orchestrated the replacement and surrender of, the $6 million Transamerica insurance policy with two $3 million policies. The replacement policies (one a universal life policy and the other a term policy) were both issued by Protective Life Insurance Company.

24.     When BB&T Bank began serving as the Trustee of the Bowers Insurance Trust, Mrs. Bowers' other assets, including hundreds of thousands of shares in AFLAC stock, were then held at another financial services firm.

25.     In the late 1990's and the first decade of the 21st Century, BB&T Bank was expanding rapidly. During this expansion mode, BB&T Bank also sought to expand its investment offerings, enlarge its customer base, and grow its assets under management. During this period, and particularly in 2006, BB&T sought to expand its role beyond that of Mrs. Bowers' trusted fiduciary and advisor to her related to the Insurance Trust. In short, BB&T Bank sought to manage all of her financial assets.

26.     BB&T Bank represented to the public, to its other clients, and to Mrs. Bowers that it was a prudent, safe, financially knowledgeable and trustworthy institution skilled and experienced in the management of funds, assets and wealth and would provide services and advice to clients in accordance with each client's particular needs and best interests.

5

27.     BB&T Bank encouraged Mrs. Bowers to trust the Bank's approach to wealth management and its adherence to a corporate philosophy based on high moral obligations to its clients. BB&T Bank represented that, if Mrs. Bowers turned over her financial life to BB&T, the Bank would craft comprehensive solutions tailored to her individual needs and provide prudent, holistic management of her assets and income sufficient to meet her current and future needs.

28.     As an elderly person dependent upon income from her investments, Mrs. Bowers needed and wanted the safety and security of fiduciary management of her irreplaceable assets. BB&T Bank assured Mrs. Bowers that it, through its Wealth Management/Trust Department, would provide the added protection and oversight due from knowledgeable fiduciaries. Because of the fiduciary duties expressly undertaken by BB&T Bank, through its Wealth Management/Trust Department, BB&T Bank was obligated to advise Mrs. Bowers with undivided loyalty, with her best interests in mind, and with competent, non-conflicted advice.

29.     Relying on BB&T Bank's representations, Mrs. Bowers, who was 84 years old in August 2006, engaged BB&T Bank and BB&T Asset Management as her fiduciaries and entrusted them with her assets, so that she could benefit from the Wealth Management/Trust Department's prudent and conservative management of those assets under the plans Defendants promised to develop for her.

30.     BB&T Bank, BB&T Asset Management, and Mrs. Bowers entered into a contractual relationship, memorialized by the August 16, 2006 BB&T Wealth Management Agreement ("WMA"), a copy of which is attached as Exhibit 1 to this Complaint. The WMA set forth the duties undertaken by each of the corporate entities. BB&T Bank promised that, *inter alia*, it would:

    A. Gather information from the Client regarding the Client's investment objectives, risk tolerance and investment horizon, tax status, financial situation and needs;

    B. Make recommendations to the Client regarding an investment program and investment guidelines for the Account; and

    C. Coordinate and supervise the services of the Investment Advisor and Custodian for the Account.

Exhibit 1 at 1.

    31.    BB&T Asset Management promised that, *inter alia*, it would:

    A. Consult with the Client and the BB&T Bank Wealth Advisor to establish investment objectives for the Client; and

    B. Within the established investment objectives, invest, including purchasing or selling assets, in the Client Account, with complete investment discretion.

*Id.* at 1-2.

    32.    BB&T Bank also offered and agreed to act as the personal representative of Mrs. Bowers' estate upon her death.

    33.    Furthermore, BB&T either orally or impliedly agreed to advise Mrs. Bowers honestly, fairly, competently and prudently, in accordance with her best interests, and with undivided loyalties, always putting Mrs. Bowers' interests ahead of BB&T's, and to comply with all industry standards and contractual obligations undertaken by BB&T, as well as any applicable state laws in the management of Mrs. Bowers' assets.

7

34.     BB&T Bank knew that the form WMA Defendants presented to Mrs. Bowers contained errors, misstatements, and deliberate misrepresentations and that BB&T Bank did not intend to fulfill, and in fact could not and would not fulfill, the promised duties and obligations as described in the WMA, although those duties and obligations were central to the fiduciary relationship that BB&T Bank induced Mrs. Bowers to establish. Unbeknownst to Mrs. Bowers, BB&T Bank was restricted from fulfilling the duties and obligations which it promised to perform as an integral part of that fiduciary relationship. Defendants did not inform Mrs. Bowers that the Agreement would not be fulfilled as represented and promised.

35.     While acting as Mrs. Bowers' wealth manager, BB&T counseled, advised, and recommended to Mrs. Bowers a strategy that, unbeknownst to Mrs. Bowers, was aggressive, excessively risky and completely inappropriate and unsuitable for an elderly, inexperienced and financially unsophisticated person like Mrs. Bowers and, furthermore, insufficient to meet her then income expenditures, including the payment of premiums for the Insurance Trust for which BB&T Bank was already acting as fiduciary.

36.     Rather than recommending that Mrs. Bowers reduce her AFLAC stock holdings and develop a diversified and prudent portfolio to generate income, BB&T instead advised that she follow an investment strategy based upon derivatives trading with the AFLAC stock. This strategy required the execution of a highly complex derivative product known as a Variable Prepaid Forward Contract ("VPFC"). BB&T represented that VPFCs would raise cash to create a separate diversified wealth management account portfolio to be established and managed by Defendants. BB&T's scheme maximized the generation of fees for BB&T and was designed to benefit Defendants at Mrs. Bowers' expense, all of which was unknown to Mrs. Bowers.

8

37.     While BB&T either knew or should have recognized the speculative nature of this scheme, they nonetheless advised that the long-term retention of Mrs. Bowers' concentrated holding of AFLAC stock and the use of the VPFC derivative product was not speculative but was instead an appropriate defensive strategy suitable for an elderly person lacking in financial sophistication and investment experience in derivative products and strategies.

38.     The strategy devised by BB&T was intended to induce the transfer of substantially all of Mrs. Bowers' liquid investments, holdings and assets to BB&T's Wealth Management Division over which BB&T promised to exercise investment supervision and management responsibilities.   Unbeknownst to Mrs. Bowers, the purpose of this move was to generate substantial fees for BB&T Bank and BB&T Asset Management.

39.     BB&T represented that they had special expertise in VPFCs and could therefore recommend and sell the product and the associated strategy to Mrs. Bowers as suitable, appropriate, and prudent, as well as the best method to generate funds to pay off outstanding debt, reduce the risk of a concentrated position, create a diversified portfolio, protect her irreplaceable assets, and avoid creating any taxable events during her lifetime while securing for her and her estate the advantage of a stepped-up basis in the AFLAC stock at her death.

40.     Defendants did not explain the speculative and risky nature of the VPFC or the enormous associated fees and costs.   Specifically, when the strategy was proposed, BB&T, in violation of their fiduciary, common law, statutory and contractual obligations, failed to provide Mrs. Bowers with any of the following:   a complete and understandable description of the embedded and upfront costs and fees associated with VPFCs; a complete and understandable description of the investment risks involved in the transaction and proposed strategy; or any viable, well researched, tried and true, and historically proven options or alternatives.

9

41.     BB&T did not disclose, explain, or otherwise provide complete and accurate explanations of the negative implications of Mrs. Bowers' participation in a VPFC and the associated strategy, including, but not limited to:

        A.     The riskiness of the VPFCs;

        B.     The unsuitability of VPFCs for a person in Mrs. Bowers' position and station in life;

        C.     That VPFCs and the associated strategy increased risk, rather than reducing it;

        D.     The full costs and fees associated with the VPFC, embedded or otherwise; and

        E.     That the VPFC strategy trapped Mrs. Bowers into a never-ending series of rollovers throughout her lifetime such that the costs to Mrs. Bowers would eventually decimate her irreplaceable assets.

42.     In reliance upon the advice provided by BB&T and at their direction, Mrs. Bowers executed a three year VPFC ("VPFC No. 1") covering 210,000 shares of AFLAC stock.

43.     In furtherance of the wealth management scheme designed by BB&T, BB&T Bank first applied the proceeds of VPFC No.1 to satisfy Mrs. Bowers' outstanding obligations, paying off debt owed to another financial institution and thereby simultaneously securing the transfer of her financial assets to the control of BB&T. The remaining proceeds from VPFC No. 1 were entrusted to BB&T for management ("Investment Account").

44.     BB&T Bank represented that the purpose of the VPFC was to raise cash from which to create a diversified portfolio for Mrs. Bowers and to protect her irreplaceable assets from loss.

10

Notwithstanding these representations, BB&T knew that their recommended strategy was unsuitable and risky and placed Mrs. Bowers' life savings in serious jeopardy of destruction.

45.     BB&T had complete discretion in and totally controlled the Investment Account, the trading activity in that Account, and any purported investment strategy. Believing that BB&T was acting as her fiduciary and protecting Mrs. Bowers' interests, BB&T's advice was followed and not questioned nor was there reason to question that advice, which, unbeknownst to Mrs. Bowers, was imprudent, aggressive, uninformed, reckless, and in breach of the contractual, fiduciary, common law, and statutory obligations BB&T owed to Mrs. Bowers.

46.     Mrs. Bowers did not receive the diversified portfolio promised by BB&T when they sold her the VPFC, but was instead doubly exposed to market risk, which was unsuitable and inappropriate for an investor of her age and inexperience and with her need for a reliable source of income.

47.     Although BB&T recommended the VPFC purportedly as part of a comprehensive and holistic wealth management plan, her fiduciaries did not explain and Mrs. Bowers did not understand the operation and/or limitations of the VPFC. BB&T knew, although it did not advise Mrs. Bowers of this, that the investment strategy locked her into a continuing, endless, expensive, and damaging cycle of rollovers requiring payment of more and more costs and fees despite further depletion of the amount available for investment by the substantial costs of the initial investment and subsequent roll-overs. BB&T's reckless, imprudent, and incompetent advice and actions placed Mrs. Bowers into a financial death spiral; however, because BB&T failed to explain the operation of the VPFC and its inherent risks and enormous costs, Mrs. Bowers was completely unaware that her meaningful options as well as her financial well-being had been sabotaged, destroyed and hugely damaged.

11

48.     After the initial sale by BB&T of the VPFC and associated strategy to Mrs. Bowers, BB&T recommended, arranged, and sold to Mrs. Bowers four subsequent VPFC rollovers, the last being completed in June 2014. In each rollover as it had advised initially, BB&T Bank recommended, advised, facilitated, sold, and arranged rollover VPFCs as the best option for Mrs. Bowers' financial well-being and the best option to protect her assets and income needs.

49.     Reassured by these promises and representations from BB&T in their role as her trusted fiduciaries whom she believed to be reputable financial advisors with her best interests in mind, Mrs. Bowers followed Defendants' advice to continue the VPFC strategy.

50.     Unbeknownst to Mrs. Bowers, that investment strategy was too risky and unsuitable for an elderly and unsophisticated investor like her but because of her faith, trust and confidence in Defendants, Mrs. Bowers remained unaware that her trust was misplaced and that her assets continued to be exposed to enormous risk, imprudent investment and general mismanagement.

51.     In late 2012, Mrs. Bowers and many other BB&T clients received a letter which included the following statement:

> Recently, as a part of a review of client accounts we discovered that a fee was charged to your account that we wish to refund to you. While we are not required to rebate these fees, we choose to do so as a reflection of our corporate values. … This fee would not have been charged under our current billing practices … Thank you for the trust and confidence you have placed in BB&T Wealth.

Unbeknownst to Mrs. Bowers, this statement was incorrect and deliberately designed to be misleading. The actual impetus for the fee refund was the criticism of BB&T Asset Management's fee practices by the Securities and Exchange Commission ("SEC"). The SEC had criticized BB&T Asset Management's practice of charging transaction-based "broker-esque" fees for selling derivative products including VPFCs even though that entity lacked a broker-dealer license.

Although BB&T was still serving as Mrs. Bowers' fiduciary, and thus had an absolute obligation of disclosure of material facts to her, upon which she had a right to rely, BB&T deliberately, fraudulently, and deceptively misled Mrs. Bowers and other clients regarding the refund to obscure the nature of their business practices.

52.     Despite their continuing status as Mrs. Bowers' fiduciaries, BB&T has never disclosed to Mrs. Bowers or otherwise acknowledged any of the errors, misrepresentations or unfair and deceptive practices as alleged in this Complaint. To the contrary, Defendants have at all times maintained and portrayed their advice and recommendations as being an appropriate strategy suitable for an elderly person like Mrs. Bowers who lacks financial sophistication or investment experience in derivatives.

53.     As a result of the incompetent, reckless, fraudulent and imprudent "wealth management" provided by BB&T, Mrs. Bowers' assets and income have been decimated, while her faithless fiduciaries have profited at her expense. Mrs. Bowers placed her faith and trust in BB&T, and their advice and recommended strategy leaves her financially exposed and vulnerable at precisely the time in her life that BB&T promised she would be financially safe and secure.

## FOR A FIRST CAUSE OF ACTION
### Breach of Contract and Covenant of Good Faith and Fair Dealing

54.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this First Cause of Action.

55.     Upon the creation of the investment advisory relationship between Mrs. Bowers and the BB&T Wealth Management/Trust Department, and then as Mrs. Bowers' assets began to be managed by Defendants, BB&T entered into both express agreements and implied agreements with Mrs. Bowers, as formalized in the BB&T Wealth Management Agreement. These

13

agreements constituted contracts between Mrs. Bowers and BB&T (hereinafter "the Agreements").

56.     As a client of BB&T and also pursuant to the Wealth Management Agreement which formalized the relationship between the parties, BB&T owed Mrs. Bowers the duty to advise her honestly, fairly, competently, and prudently, and in accordance with her needs, goals and best interests.

57.     In addition, Georgia law further implies a covenant of good faith and fair dealing into every contract, including the Wealth Management Agreement and the VPFCs arranged and recommended by BB&T.

58.     Defendants breached their Agreements with Mrs. Bowers in one or more of the following particulars:

> A.     Defendants repeatedly placed their own interests ahead of Mrs. Bowers' by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was financially lucrative for Defendants but unsuitable, imprudent, aggressive, uninformed, conflicted, and reckless for Mrs. Bowers;
>
> B.     Defendants failed to conduct the thorough and individualized analysis of Mrs. Bowers' financial situation and also failed to prepare the financial plan for her as promised in the Agreements and instead treated her as a profit center and cross-selling opportunity;
>
> C.     Defendants failed to prepare a financial plan for Mrs. Bowers as promised and failed to conduct an analysis to determine and advise her about the

14

suitability of their recommended strategy to meet her expenditures and to protect her irreplaceable assets;

D.   Defendants repeatedly advocated and recommended risky derivative products that not only failed to meet Mrs. Bowers' investment objectives and income needs but actually increased the risks to her irreplaceable assets while guaranteeing substantial profits for Defendants;

E.   Despite knowing that their plan was risky and unsuitable, Defendants nonetheless created and recommended to Mrs. Bowers a wealth management and investment plan based on a series of speculative and costly VPFCs without advising her of their known speculative nature, nor of the substantial risks, costs and fees associated with the on-going plan devised and recommended by Defendants;

F.   Defendants created a multi-level fee structure when they advised Mrs. Bowers to purchase a series of risky derivative products (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mrs. Bowers';

G.   Defendants knew, but failed to disclose to Mrs. Bowers, that their continuing "wealth management" strategy would trap her into a financial death spiral of repeated VPFC roll-overs triggering substantial fees which would eventually exhaust the value of her irreplaceable financial assets, leaving her vulnerable, financially insecure and dependent in the final years of her life;

H.  Defendants knew of, but failed to disclose to Mrs. Bowers their own financial interests in recommending a series of speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.  Defendants lacked the expertise concerning wealth management promised in the Agreements and thus failed to ascertain or understand the nature and type of securities promoted to and purchased for Mrs. Bowers and/or misrepresented those securities to her, resulting in substantial losses due to unsuitable and imprudent investments being made on her behalf; and/or

J.  Defendants advised Mrs. Bowers to invest her funds in successive VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mrs. Bowers.

59.  Defendants' acts and omissions constitute failures to abide by the terms of the Agreements and constitute breaches of the Agreements entered into with Mrs. Bowers as well as breaches of the covenant of good faith and fair dealings. Mrs. Bowers has been directly and proximately damaged as a result of Defendants' breaches. In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets.

60.  Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) attorneys' fees, (4) costs, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

16

## FOR A SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

61.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Second Cause of Action.

62.     Mrs. Bowers expressly sought the safety and security of fiduciary management for her irreplaceable assets.  Defendants, both individually and collectively, agreed to act as her fiduciaries. Defendants, who were already serving as trustees over the Bowers Insurance Trust, undertook to provide fiduciary wealth management and investment advisory services to Mrs. Bowers and also agreed to serve as the personal representative of her estate after her death.  Such relationships are fiduciary under Georgia law and were recognized as such by Defendants in the BB&T Code of Ethics.

63.     Mrs. Bowers' relationship with Defendants involved a relationship of the utmost trust and confidence because of the parties' preexisting relationships, the nature of the transactions in question, and the parties' Agreements, both express and implied.  This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, both individually and collectively, to act with perfect good faith and undivided loyalty in the interests of Mrs. Bowers.

64.     As the fiduciaries of Mrs. Bowers, Defendants owned clear duties to Mrs. Bowers of undivided loyalty, absolute faithfulness, and to exercise due care and diligence with respect to the wealth management and control of Mrs. Bowers' investments, assets and accounts.

65.     The fiduciary relationship assumed and agreed to by BB&T also imposed duties and obligations to keep Mrs. Bowers fully informed of all facts pertinent to any recommended investments (including but not limited to the VPFCs) which BB&T arranged for Mrs. Bowers, to make full disclosure of all facts that could materially affect her financial well-being, to avoid

17

conflicts of interests where BB&T could and did place its interests and its affiliates' interests above Mrs. Bowers' interests, to promptly disclose to Mrs. Bowers any actual or potential conflict of interest, and to exercise reasonable care, diligence, and prudence in the performance of its duties.

66.    At the urging of Defendants, Mrs. Bowers reposed a special confidence in Defendants by entrusting her assets to Defendants, who agreed to accept them and to act as her fiduciaries in providing wealth management and investment advice and related services. Defendants breached their fiduciary duties in one or more of the following particulars:

> A.    Defendants repeatedly placed their own interests ahead of Mrs. Bowers' by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was financially lucrative for Defendants but imprudent, aggressive, uninformed, conflicted, and reckless for Mrs. Bowers;

> B.    Defendants failed to conduct the thorough and individualized suitability analysis of Mrs. Bowers' financial situation and also failed to prepare the financial plan for her as promised in the Agreements and instead treated her as a profit center and cross-selling opportunity;

> C.    Defendants failed to prepare a financial plan for Mrs. Bowers as promised and failed to conduct an analysis to determine and advise her about the suitability of their recommended strategy to meet her expenditures and to protect her irreplaceable assets;

> D.    Defendants repeatedly advocated and recommended risky derivative products that not only failed to meet Mrs. Bowers' investment objectives

18

and income needs but actually increased the risks to her irreplaceable assets while guaranteeing substantial profits for Defendants;

E.    Despite knowing that their plan was risky and unsuitable, Defendants nonetheless created and recommended to Mrs. Bowers a wealth management and investment plan based on a series of speculative and costly VPFCs without advising her of the known speculative nature, nor of the substantial risks, costs and fees associated with the on-going plan devised and recommended by Defendants;

F.    Defendants created a multi-level fee structure when they advised Mrs. Bowers to purchase a series of risky derivative products (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mrs. Bowers';

G.    Defendants knew, but failed to disclose to Mrs. Bowers, that their continuing "wealth management" strategy would trap her into a financial death spiral of repeated VPFC roll-overs triggering substantial fees which would eventually exhaust the value of her irreplaceable financial assets, leaving her vulnerable, financially insecure and dependent in the final years of her life;

H.    Defendants knew of, but failed to disclose to Mrs. Bowers their own financial interests in recommending a series of speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

19

I.     Defendants lacked the expertise concerning wealth management promised in the Agreements and thus failed to ascertain or understand the nature and type of securities promoted to and purchased for Mrs. Bowers and/or misrepresented those securities to her, resulting in substantial losses due to unsuitable and imprudent investments being made on her behalf;

J.     Defendants advised Mrs. Bowers to invest her funds in successive VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mrs. Bowers; and/or

K.     Defendants misrepresented the facts related to the December 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities. Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

67.     In one or more of the preceding particulars, Defendants acted with imprudence, recklessness, willful misconduct, fraudulent intent, and bad faith and thereby breached the fiduciary duties owed to Mrs. Bowers, proximately causing her to suffer damages. In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets.

68.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be

20

determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A THIRD CAUSE OF ACTION
### Breach of Contract Accompanied By Fraudulent Act

69.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Third Cause of Action.

70.     As a client of BB&T and pursuant to the WMA with the Bank, Mrs. Bowers had Agreements with each Defendant, pursuant to which Defendants owed her a covenant of good faith and fair dealing under Georgia law and a duty to advise her honestly, fairly and in accordance with her needs, goals and best interests and consistent with the promises made in the WMA.

71.     Defendants' fraudulent misconduct, actions and inactions, as alleged in this Complaint, constitute a failure to abide by the terms of Defendants' contracts with Mrs. Bowers, including the WMA, and constitute a breach of the Agreements entered into with her as well as breaches of the covenant of good fair and fair dealing.  Mrs. Bowers has been directly and proximately damaged as a result of Defendants' breaches.

72.     Moreover, in breaching the Agreements with Mrs. Bowers, Defendants exhibited a fraudulent intent relating to those breaches.

73.     Defendants' breaches of the Agreements were accompanied by fraudulent acts and/or omissions on the part of Defendants in one or more of the following particulars:

> A.     Defendants breached the Agreements by using form contracts which promised to perform duties and provide services which they had no intention or ability to perform or provide;

21

B.      Defendants breached the Agreements when they repeatedly allowed their untrained and misinformed representatives to sell products and strategies which they were unqualified to sell without disclosing that these representatives lacked the wealth management expertise promised by the Agreements;

C.      Defendants breached the Agreements when their strategy based upon the retention of the concentrated position in AFLAC stock and execution of VPFCs failed to protect Mrs. Bowers' assets, income and net worth, despite repeated representations to her that they would provide such protections and then, through the acts and omissions alleged in this Complaint, attempted to disguise the shortcomings of the strategy known to Defendants by repeatedly misrepresenting and/or failing to disclose to Mrs. Bowers accurate and truthful information related to the costs and risks of the strategy based on the VPFCs;

D.      Defendants breached the Agreements by placing their own interests ahead of Mrs. Bowers' interests by creating, recommending, and executing an on-going risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, and reckless, while assuring Mrs. Bowers that the strategy was instead defensive, prudent and suitable for her;

E.      Defendants breached the Agreements by repeatedly recommending and selling risky derivative products which guaranteed substantial profits for Defendants but failed to meet Mrs. Bowers' investment objectives and

income needs, while assuring Mrs. Bowers that these products were defensive, prudent and suitable for her, although they actually increased the risk to her assets;

F.      Defendants breached the Agreements by repeatedly recommending and executing wealth management and investment schemes premised upon Mrs. Bowers' holding of an over-concentrated position of AFLAC stock which advanced Defendants' interests but failed to meet Mrs. Bowers' investment objectives and income needs, while repeatedly assuring Mrs. Bowers that this strategy was defensive, prudent and suitable for her, although they actually increased the risk to her assets;

G.      Defendants breached the Agreements by recommending and executing an on-going wealth management and investment plan based on VPFCs known to Defendants to be speculative and costly, while Defendants repeatedly assured Mrs. Bowers that this strategy was defensive, prudent and suitable and simultaneously failed to advise her of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

H.      Defendants breached the Agreements by recommending and selling investment products as being suitable for Mrs. Bowers, when in fact they knew that such investment products were not suitable for Mrs. Bowers given her age and position as a retired person lacking in sophistication and investment experience in derivative products and actually increased the risk to her assets;

I.   Defendants breached the Agreements by representing to Mrs. Bowers that VPFCs were reasonable and sound vehicles by which Mrs. Bowers could attain her investment goals and meet her income needs, while providing liquid funds to pay off her debts, when they knew or should have known that this strategy was doomed to failure and that this undisclosed information was material to Mrs. Bowers;

J.   Defendants breached the Agreements by recommending multiple successive roll-overs of the VPFC, while failing to advise Mrs. Bowers about the enormous early termination and roll-over fees associated with those transactions, when they knew or should have known that the undisclosed information about fees was material to Mrs. Bowers; and/or

K.   Defendants misrepresented the facts related to the December 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities. Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

74.   As a direct, consequent and proximate result of Defendants' breaches of contract accompanied by fraudulent acts, Mrs. Bowers has suffered damage in violation of the laws of the State of Georgia.

75.   Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the fraudulent acts accompanying

the breaches of the Agreements, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, (6) and such other relief as is just, equitable, and proper.

### FOR A FOURTH CAUSE OF ACTION
### (STATE SECURITIES ACT VIOLATIONS)

76.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fourth Cause of Action.

77.     In the course of their fiduciary duties to Mrs. Bowers, Defendants recommended and advised that she enter into unsuitable transactions involving *inter alia*, the VPFCs and the Investment Account, and in so doing, misrepresented the risk of the products and Investment Account to Mrs. Bowers and thereby defrauded her as is set forth in more detail in this Complaint.

78.     The actions, inaction, untrue statements and omissions of Defendants were made (or not disclosed) to Mrs. Bowers in connection with the offer, sale, or purchase of securities, either directly or indirectly, including, but not limited to, the VPFCs and the securities bought and sold in the Investment Account.

79.     The fraud herein alleged to have been committed by Defendants was accomplished by means of untrue statements of material fact or omissions of material facts.

80.     On information and belief Defendants were compensated, either directly or indirectly, for the investment advice and services provided, all of which was accomplished by means of untrue statements and the development and implementation of an investment scheme that rewarded Defendants, but defrauded Mrs. Bowers as alleged herein.

81.     The actions of Defendants were wrongful, fraudulent, and in violation of OCGA § 10-5-58, *et seq.,* and the regulations, rules, and standards regulating broker conduct established thereunder.

82.     As a consequent and proximate result of the fraud perpetrated and the misrepresentations and material omissions made by Defendants, Mrs. Bowers suffered substantial damages.  In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets.

83.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) costs, (3) attorneys' fees, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable and proper.

## FOR A FIFTH CAUSE OF ACTION
### Fraudulent Misrepresentation

84.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fifth Cause of Action.

85.     Defendants represented to Mrs. Bowers that the Wealth Management/Trust Department of the Bank was highly trained, thoroughly knowledgeable, and dedicated to championing client interests, and that BB&T specialized in working with clients to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of that particular client.

86.     Defendants further represented to Mrs. Bowers that they had special expertise in VPFCs and that the investment strategy devised and recommended by Defendants, including the unsuitable VPFC and subsequent investment scheme, as it continued through each subsequent rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, and help her achieve important diversification goals.

26

87.     Given Mrs. Bowers' investment profile, including her age, retirement goals and tolerance to risk, as well as her lack of investment knowledge and experience, Defendants' representations were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

88. Defendants knew that each representation made to Mrs. Bowers regarding the investment strategy they devised were false, and in recommending the strategy and its continued use to Mrs. Bowers, they exhibited a reckless disregard for the truth and/or falsity of their representations.

89.     Defendants further misrepresented the facts related to the December 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

90.     Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

91.     Mrs. Bowers relied upon the representations made to her by the Defendants, all of whom were acting as her fiduciary.

92.     Defendants intended for Mrs. Bowers to act upon their advice and representations, which was given in the course of the fiduciary relationship existing between Defendants and Mrs. Bowers.

93.     Mrs. Bowers did not realize or understand the falsity of Defendants' representations.

94.     Mrs. Bowers had a right to rely upon the representations made to her by Defendants, her fiduciaries.

27

95. Defendants' representations were false, ill-conceived and imprudent, reckless, willful, fraudulent, and made in bad faith, and Mrs. Bowers' reliance upon Defendants' representations were the proximate cause of the damages that she has suffered. In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets and income.

96. Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A SIXTH CAUSE OF ACTION
### Constructive Fraud

97. The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Sixth Cause of Action.

98. Defendants represented to Mrs. Bowers that its Wealth Management/Trust Department was highly trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and that it specialized in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.

99. Defendants further represented to Mrs. Bowers that they had special expertise in VPFCs that the investment strategy devised and recommended by Defendants, including the unsuitable VPFC and subsequent investment scheme as it continued through each subsequent

28

rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, and help her achieve important diversification goals.

100. Given Mrs. Bowers' investment profile, including her age, retired status, income needs and tolerance to risk, as well as her lack of investment knowledge and experience, Defendants' representations were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

101. In their capacity as Mrs. Bowers' fiduciaries, which capacity they had solicited and for which they were compensated, Defendants should have known the falsity of the representations they made to Mrs. Bowers with respect to the unsuitable investment strategy, and in recommending the strategy to Mrs. Bowers, Defendants exhibited a reckless disregard for the truth and/or falsity of their representations.

102. Defendants further misrepresented the facts related to the December 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

103. In their capacity as Mrs. Bowers' fiduciaries, which capacity they had solicited and for which they were compensated, Defendants should have known the falsity of the representations they made to Mrs. Bowers with respect to the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

104. The false representations made by Defendants were material to Mrs. Bowers' decision to entrust her investment assets to the management and fiduciary care of Defendants and to continue that relationship of fiduciary trust; and Defendants intended Mrs. Bowers to act upon those false representations.

29

105.    Mrs. Bowers was completely unaware of the falsity of the representations made to her by Defendants, including the imprudence of the investment strategy devised by Defendants and their agents and employees and Defendants' misconduct in providing their services.

106.    Mrs. Bowers had a right to rely upon the representations made to her by Defendants and did, in fact, rely upon those representations.

107.    Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mrs. Bowers' reliance upon Defendants' representations were the proximate cause of the damages that she has suffered. In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets and income.

108.    Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A SEVENTH CAUSE OF ACTION
### Fraud in the Inducement

109.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Seventh Cause of Action.

110.    Defendants fraudulently misrepresented to Mrs. Bowers that the investment strategy devised and recommended by them, including the unsuitable VPFC and subsequent investment scheme, as it continued through each subsequent rollover, would allow Mrs. Bowers

30

to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, and help her achieve important diversification goals.

111.    Defendants' misrepresentations to Mrs. Bowers were intended to deceive her and to encourage her to entrust her investment assets to Defendants for investment in an ill-conceived, risky, flawed, and completely unsuitable strategy, which put Mrs. Bowers' investments assets in fee-generating accounts under Defendants' exclusive control.

112.    Given Mrs. Bowers' investment profile, including her age, retirement goals and tolerance to risk, as well as her lack of investment knowledge and experience, Defendants' representations were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

113.    Defendants knew that each representation made to Mrs. Bowers regarding the investment strategy they devised were false, and in recommending the strategy and its continued use to Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

114.    Defendants further misrepresented the facts related to the December 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

115.    Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

116.    Mrs. Bowers had a right to rely upon the representations made to her by her fiduciaries, and she did so rely to her great detriment.

117.    Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mrs. Bowers' reliance upon Defendants'

31

representations were the proximate cause of the damages that she has suffered. In addition, Defendants' false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith representations decimated Mrs. Bowers' assets and income.

118.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR AN EIGHTH CAUSE OF ACTION
### Negligent Misrepresentation

119.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Eighth Cause of Action.

120.     The misrepresentations made by Defendants as described in this Complaint were made negligently, grossly negligently, willfully and/or recklessly.

121.     Defendants misrepresented to Mrs. Bowers that the investment strategy devised and recommended by them, including the unsuitable VPFC and aggressive investment scheme, as it continued through each rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, and help her achieve important diversification goals.

122.     The above-referenced representations were false, as the strategies employed by Defendants did not achieve the goals promised to Mrs. Bowers.

123. Defendants further misrepresented the facts related to the December 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

124. In their capacity as Mrs. Bowers' fiduciaries, which capacity they had solicited and for which they were compensated, Defendants should have known the falsity of the representations they made to Mrs. Bowers with respect to the fee refund, and in concealing their misconduct from Mrs. Bowers, they exhibited a negligent and reckless disregard for the truth.

125. Defendants had a pecuniary interest in advocating for an investment strategy that would place Mrs. Bowers' assets into fee generating accounts under the sole control of Defendants.

126. Mrs. Bowers' relationship with Defendants involved a relationship of the utmost trust and confidence. Defendants had agreed to act as Mrs. Bowers fiduciaries, thus requiring them to act with perfect good faith and undivided loyalty in the interests of Mrs. Bowers.

127. Defendants breached their fiduciary duties and made misrepresentations to Mrs. Bowers in one or more of the particulars described in this Complaint.

128. Mrs. Bowers had a right to rely upon the representations made to her by Defendants who were her fiduciaries, and she did rely to her great detriment.

129. Defendants' representations were false, ill-conceived and imprudent, negligent, reckless, willful, and made in bad faith, and Mrs. Bowers' reliance upon Defendants' representations were the proximate cause of the damages that she has suffered.

130. Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the negligence, gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount

33

to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A NINTH CAUSE OF ACTION
### Civil Conspiracy

131.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Ninth Cause of Action.

132.    Defendants BB&T Bank and BB&T Asset Management, through their respective employees, agents, servants, and representatives, including their respective corporate predecessors in interest, conspired with each other to breach their agreements with and/or legal duties and obligations to Mrs. Bowers.

133.    Defendants acted in concert in a deceitful and fraudulent manner, conspiring to engage in conduct to harm Mrs. Bowers, as described in each of the causes of action above. Defendants actions included, but are not limited to:

>    A. Conspiring to breach the WMA with Mrs. Bowers, by having no intention of fulfilling, and then failing to fulfill their duties and obligations set forth in the WMA;
>
>    B. Conspiring to breach the fiduciary duties owed to Mrs. Bowers;
>
>    C. Conspiring to breach the WMA with Mrs. Bowers with fraudulent intent and through fraudulent acts, misrepresentations, and deliberate omissions;
>
>    D. Conspiring to violate the State Securities Act by, *inter alia*, failing to conduct the required suitability analysis, making material misrepresentations and omissions in the recommendation and sale of securities including but not limited to the VPFCs,

34

and charging and receiving transaction-based fees for brokerage type services for which they were not properly registered;

E.  Conspiring to misrepresent facts regarding the investment strategy recommended and sold to Mrs. Bowers upon which she was entitled to, and did, in fact, rely;

F.  Conspiring to misrepresent facts and deceive Mrs. Bowers regarding BB&T's expertise, their knowledge, or lack thereof, of the investment strategy recommended and sold to Mrs. Bowers, their failure to perform a suitability analysis for Mrs. Bowers, and their failure to develop a prudent financial plan for Mrs. Bowers;

G.  Conspiring to deceive Mrs. Bowers by misrepresenting the facts related to the fee refund in December 2012 and hiding from her the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities; and

H.  Conspiring to induce Mrs. Bowers to accept Defendants' fee-driven strategy through misrepresentation of the facts and risk surrounding the investment strategy recommended and sold to Mrs. Bowers.

134.   Defendants agreed to and did, in fact, conspire with one another to breach their agreements with and/or legal duties and obligations to Mrs. Bowers, and Defendants' conspiracy proximately caused damage to Mrs. Bowers.

135.   Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) special and/or punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, (6) attorney's fees, and (7) such other relief as is just, equitable and proper.

## FOR A TENTH CAUSE OF ACTION
### Georgia Racketeer Influenced and Corrupt Organizations Act

136.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Tenth Cause of Action.

137.    Defendants actions as described in this Complaint constitute violations of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, O.C.G.A. §§ 16-14-1 *et seq.*

138.    Defendants engaged in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, as set forth in O.C.G.A. §§ 16-14-3 (8)(A), (9)(A).

139.    Defendants' predicate acts committed in furtherance of their pattern of racketeering activity in violation of O.C.G.A. §§ 16-14-4 include, but are not limited to:

      A. Obtaining control over Mrs. Bowers' irreplaceable assets by means of a deceitful and/or artful practice with the intention of profiting from same at the expense of Mrs. Bowers (O.C.G.A. 16-14-3(9)(A)(ix) and O.C.G.A. 16-8-3);

      B. Knowingly and intentionally recommending and advising Mrs. Bowers to enter unsuitable transactions and investments, misrepresenting the risk of these products and investments, failing to be properly registered to transact the recommended transactions, employing untrue statements and/or omissions in connection with the offer, sale, or purchase of securities, and receipt of compensation for all of the above (O.C.G.A. 16-14-3(9)(A)(xxix) and O.C.G.A. §§ 10-5-1 *et seq.* (Georgia Uniform Securities Act of 2008);

C. Knowingly and intentionally engaging in a scheme or artifice to defraud Mrs. Bowers of her irreplaceable assets through the use of and furtherance by interstate wire communications (O.C.G.A. 16-14-3(9)(A)(xxix) and 18 U.S.C.A. § 1961 (B) (wire fraud); and

D. Perpetrating a fraud in the sale of securities to Mrs. Bowers (O.C.G.A. 16-14-3(9)(A)(xxix) and 18 U.S.C.A. § 1961 (D) (fraud in the sale of securities));

140. Defendants' pattern of racketeering activity was motivated by a pecuniary interest in Mrs. Bowers' irreplaceable assets in which Defendants acquired and maintained, both directly and indirectly, an interest and control. Defendants' pattern of racketeering activity was willful, intentional, and knowing.

141. Mrs. Bowers has suffered damages as a result of the aforementioned pattern of racketeering activity and practices employed by Defendants.

142. Mrs. Bowers is therefore informed and believes that she is entitled to a judgment against Defendants for actual and consequential damages, treble damages, punitive damages, attorneys' fees, and costs of investigation and litigation pursuant to the Georgia RICO Act, and such other further relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE,** having set forth her claims, Plaintiff prays for judgment against Defendants as follows:

a.   For actual damages;

b.   For consequential damages;

c.   For treble damages;

d.   For punitive damages in an amount to be determined by the finder of fact;

e.     For prejudgment interest at the highest legal rate;

f.     For the costs of this action;

g.     For reasonable attorneys' fees and costs of investigation and litigation; and

h.     For such other and further relief as is just, equitable, and proper.

Respectfully submitted,

s/Gregory S. Ellington

Gregory S. Ellington, Georgia Bar No. 246863
**HATCHER, STUBBS, LAND, HOLLIS &
ROTHSCHILD, LLP**
P.O. Box 2707
Columbus, Georgia 31902-2707
(706) 324-0201

Mitchell Willoughby, Fed. Bar No. 4702
Elizabeth Zeck, Fed Bar No. 6627
Chad Johnston, Fed. Bar No. 10813
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
(Subject to Application for Admission to Practice
*Pro Hac Vice*)

Attorneys for Effie Campbell Siegling Bowers by
and through her Attorney-in-fact Terrell W. Bowers.

January 27, 2015
Columbus, Georgia