**IN THE UNITED STATED DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

EFFIE CAMPBELL SIEGLING           )
BOWERS by and through her         )
ATTORNEY-IN-FACT TERRELL          )
W. BOWERS,                        )          CASE NO. 4:15-CV-00011 (MTT)
                                  )
              Plaintiff,          )
                                  )
vs.                               )
                                  )          **(Jury Trial Demanded)**
                                  )
BRANCH BANKING AND TRUST          )
COMPANY, Successor in merger to   )
BRANCH BANKING AND TRUST          )
COMPANY OF SC, and                )
STERLING CAPITAL                  )
MANAGEMENT, LLC, Successor in     )
merger to BB&T ASSET              )
MANAGEMENT LLC,                   )
                                  )
              Defendants,         )
_____   )

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Effie Campbell Siegling Bowers ("Mrs. Bowers") by and through her Attorney-in-Fact Terrell W. Bowers complains of Defendants as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     Mrs. Bowers is a longtime citizen and resident of the County of Muscogee in the State of Georgia.

2.     Mrs. Bowers' son, Terrell W. Bowers, is the duly qualified and acting Attorney-in-Fact for his Mother and brings this action in that capacity, on her behalf, and for her benefit.

3.     Upon information and belief, Defendant Branch Banking and Trust Company ("BB&T Bank") is the successor in merger to Branch Banking and Trust Company of South Carolina and is organized under the laws of the State of North Carolina with its principal place of

1

business in Winston-Salem, North Carolina.  BB&T Bank is a citizen and resident of the State of North Carolina.

4.     Upon information and belief, BB&T Bank is the twelfth (12th) largest bank in the United States, with assets of over $182 Billion ($182,901,216,000.00), as of September 30, 2014.

5.     BB&T Bank's parent company is BB&T Corporation, a holding company that issues BB&T Corporation Stock which is traded on the New York Stock Exchange under the trading symbol "BBT."  Upon information and belief, BB&T Corporation has assets of over $187 Billion ($187,000,000,000.00) as of September 30, 2014.

6.     The major asset of BB&T Corporation is BB&T Bank, which comprises approximately ninety-eight percent (98%) of BB&T Corporation's assets.

7.     Upon information and belief, Defendant Sterling Capital Management, LLC is the successor in merger of BB&T Asset Management LLC ("BB&T Asset Management")[1] and a registered investment advisor organized under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina.  Sterling Capital Management, LLC is a citizen and resident of the State of North Carolina.

8.     Defendants BB&T Bank and BB&T Asset Management will hereinafter collectively be referred to as "BB&T."

9.     At all times relevant hereto, under agency law, common law principles of *respondeat superior*, and state securities laws, BB&T Bank and BB&T Asset Management are each jointly, severally, and fully accountable for, and totally liable for the actions, inactions, omissions and wrongdoing which were performed for and on behalf of Defendants, or any of them, by any of their agents, employees, servants and/or representatives.

---

[1]   BB&T Asset Management LLC is itself a successor in merger of BB&T Asset Management, Inc.

10.    Upon information and belief, BB&T Bank and BB&T Asset Management are both registered to do business in Georgia.  Defendants engage in continuous and systematic activities within the State of Georgia, including the use of the courts of this State to enforce contractual and other rights against citizens of Georgia.

11.    Defendants presently conduct business and, at all relevant times, conducted business and performed acts in Muscogee County, Georgia and have sufficient contacts and business within Muscogee County, Georgia so as to be subject to the *in personam* jurisdiction of this Court pursuant to the laws of Georgia.

12.    Venue is proper in the Middle District of Georgia because the most substantial parts of the acts and omissions giving rise to the causes of action in this Complaint occurred in Muscogee County, and Defendants have locations in and hold themselves out as doing business in Muscogee County.

## STATEMENT OF FACTS

13.    While Mrs. Bowers has never had the experience or training to fully understand investment products and strategies or the prudence and suitability of their use, over the last several years she has been experiencing a decline of mental acuity, memory and understanding such that she has become unable to manage the ordinary affairs of life, which required her to rely upon BB&T Bank for fiduciary services including investment advice about and management of her financial assets, all in keeping with the promises made and assurances given by BB&T Bank as it solicited the management of her financial assets and established itself as her trusted advisor and fiduciary, as is more fully described hereinafter.

14.    Effie (*nee* Campbell Siegling) Bowers was born in Charleston, South Carolina in 1921.  As of the filing of this Complaint, Mrs. Bowers is ninety-three (93) years old.

15.     She married Lloyd G. Bowers, Jr., in 1946 and moved to his hometown of Columbus, Georgia.

16.     Their marriage produced six dearly beloved children.

17.     American Family Life Assurance Company of Columbus, the predecessor of the company now known as AFLAC Incorporated ("AFLAC"), was formed in or about 1955 in Columbus, Georgia.  Mr. Bowers knew the company's founders and purchased shares in this hometown company early in its development.

18.     Over the years, Mr. Bowers' original investment in AFLAC grew as a result of the growth and appreciation in the value of the company, stock splits, and dividends.

19.     Mr. Bowers suffered a stroke in September 1983 and died in March 1994.

20.     In addition to AFLAC shares that Mrs. Bowers held in her own name, she inherited a large position in AFLAC stock from her husband, which continued to grow as a result of the growth and appreciation in the value of the company, additional stock splits, and dividends.

21.     On or about August 10, 1998, Mrs. Bowers created the Effie C.S. Bowers Irrevocable Insurance Trust ("Bowers Insurance Trust" or "Insurance Trust") to be a valuable and important part of her estate.  Mrs. Bowers initially funded the Bowers Insurance Trust with a single, $6 million universal life insurance policy issued on May 20, 1998, by Transamerica Occidental Life Insurance Company.  Over the years she faithfully paid premiums to maintain this and subsequent policies held by the Insurance Trust in full force and effect.

22.     In or around 2001, BB&T Bank became Trustee of the Bowers Insurance Trust, and thereby assumed all the obligations of a trusted fiduciary to the Bowers Insurance Trust and Mrs. Bowers.

23.     With full knowledge that Mrs. Bowers' financial assets were required to generate sufficient income to pay her living expenses, as well as premiums to maintain in full force and effect the insurance in the Bowers Insurance Trust, in or around the mid-2000's, BB&T Bank, as Trustee of the Bowers Insurance Trust, advised Mrs. Bowers to replace, and thereafter orchestrated the replacement and surrender of, the $6 million Transamerica insurance policy with two $3 million policies.  The replacement policies (one a universal life policy and the other a term policy) were both issued by Protective Life Insurance Company.

24.     When BB&T Bank began serving as the Trustee of the Bowers Insurance Trust, Mrs. Bowers' other assets, including hundreds of thousands of shares in AFLAC stock, were then held at another financial services firm.

25.     In the late 1990's and the first decade of the 21st Century, BB&T Bank was expanding rapidly.  During this expansion mode, BB&T Bank also sought to expand its investment offerings, enlarge its customer base, and grow its assets under management.  During this period, and particularly in 2006, BB&T sought to expand its role beyond that of Mrs. Bowers' trusted fiduciary and advisor to her related to the Insurance Trust.  In short, BB&T Bank sought to manage all of her financial assets.

26.     BB&T Bank represented to the public, to its other clients, and to Mrs. Bowers that it was a prudent, safe, financially knowledgeable and trustworthy institution, skilled and experienced in the management of funds, assets and wealth and would provide services and advice to clients in accordance with each client's particular needs and best interests.

27.     BB&T Bank encouraged Mrs. Bowers to trust the Bank's approach to wealth management and its adherence to a corporate philosophy based on high moral obligations to its clients.  BB&T Bank represented that, if Mrs. Bowers turned over her financial life to BB&T, the

Bank would craft comprehensive solutions tailored to her individual needs and provide prudent, holistic management of her assets and income sufficient to meet her current and future needs.

28.     As an elderly person dependent upon income from her investments, Mrs. Bowers needed and wanted the safety and security of fiduciary management of her irreplaceable assets. BB&T Bank assured Mrs. Bowers that it, through its Wealth Management/Trust Department, would provide the added protection and oversight due from knowledgeable fiduciaries.  Because of the fiduciary duties expressly undertaken by BB&T Bank, through its Wealth Management/Trust Department, BB&T Bank was obligated to advise Mrs. Bowers with undivided loyalty, with her best interests in mind, and with competent, non-conflicted advice.

29.     Relying on BB&T Bank's representations, Mrs. Bowers, who was 84 years old in August 2006, engaged BB&T Bank and BB&T Asset Management as her fiduciaries and entrusted them with her assets, so that she could benefit from the Wealth Management/Trust Department's prudent and conservative management of those assets under the plans Defendants promised to develop for her.

30.     BB&T Bank, BB&T Asset Management, and Mrs. Bowers entered into a contractual relationship, memorialized by the August 16, 2006 BB&T Wealth Management Agreement ("WMA"), a copy of which is attached as Exhibit 1 to this Complaint.  The WMA set forth the duties undertaken by each of the corporate entities.  BB&T Bank promised that, *inter alia*, it would:

> A.     Gather information from the Client regarding the Client's investment objectives, risk tolerance and investment horizon, tax status, financial situation and needs;

       B.      Make recommendations to the Client regarding an investment program and investment guidelines for the Account; and

       C.      Coordinate and supervise the services of the Investment Advisor and Custodian for the Account.

Exh. 1 at 1.

31.     BB&T Asset Management promised that, *inter alia*, it would:

       A.      Consult with the Client and the BB&T Bank Wealth Advisor to establish investment objectives for the Client; and

       B.      Within the established investment objectives, invest, including purchasing or selling assets, in the Client Account, with complete investment discretion.

*Id.* at 1-2.

32.     BB&T Bank also offered and agreed to act as the personal representative of Mrs. Bowers' estate upon her death.

33.     Furthermore, BB&T either orally or impliedly agreed to advise Mrs. Bowers honestly, fairly, competently and prudently, in accordance with her best interests, and with undivided loyalties, always putting Mrs. Bowers' interests ahead of BB&T's, and to comply with all industry standards and contractual obligations undertaken by BB&T, as well as any applicable state laws in the management of Mrs. Bowers' assets.

34.     BB&T Bank knew that the form WMA presented to Mrs. Bowers contained errors, misstatements, and deliberate misrepresentations and that BB&T Bank did not intend to fulfill, and in fact could not and would not fulfill, the promised duties and obligations as described in the WMA, although those duties and obligations were central to the fiduciary

7

relationship that BB&T Bank induced Mrs. Bowers to establish.  Unbeknownst to Mrs. Bowers, BB&T Bank was restricted from fulfilling the duties and obligations which it promised to perform as an integral part of that fiduciary relationship.  Defendants did not inform Mrs. Bowers that the Agreement would not be fulfilled as represented and promised.

35.     While acting as Mrs. Bowers' wealth manager, BB&T counseled, advised, and recommended to Mrs. Bowers a strategy that, unbeknownst to Mrs. Bowers, was aggressive, excessively risky and completely inappropriate, imprudent and unsuitable for an elderly, inexperienced and financially unsophisticated person like Mrs. Bowers and, furthermore, insufficient to meet her then income expenditures, including the payment of premiums for the Insurance Trust for which BB&T Bank was already acting as fiduciary.

36.     Rather than developing a diversified and prudent portfolio to generate income, BB&T instead advised that she follow an investment strategy based upon derivatives trading with the AFLAC stock.  This strategy required the execution of a highly complex derivative product known as a Variable Prepaid Forward Contract ("VPFC").  BB&T represented that VPFCs would raise cash to create a separate diversified wealth management account portfolio to be established and managed by Defendants.  BB&T's scheme maximized the generation of fees for BB&T and was designed to benefit Defendants at Mrs. Bowers' expense, all of which was unknown to Mrs. Bowers.

37.     While BB&T either knew or should have recognized the speculative nature of this scheme, they nonetheless advised that the long-term retention of Mrs. Bowers' concentrated holding of AFLAC stock and the use of the VPFC derivative product was not speculative but was instead an appropriate defensive strategy prudent and suitable for an elderly person lacking in financial sophistication and investment experience in derivative products and strategies.

8

38.     The strategy devised by BB&T was intended to induce the transfer of substantially all of Mrs. Bowers' liquid investments, holdings and assets to BB&T's Wealth Management Division over which BB&T promised to exercise investment supervision and management responsibilities.  Unbeknownst to Mrs. Bowers, the purpose of this move was to generate substantial fees for BB&T Bank and BB&T Asset Management.

39.     BB&T represented that they had special expertise in VPFCs and could therefore recommend and sell the product and the associated strategy to Mrs. Bowers as suitable, appropriate, and prudent, as well as the best method to generate funds to pay off outstanding debt, reduce the risk of a concentrated position, create a diversified portfolio, protect her irreplaceable assets, and avoid creating any taxable events during her lifetime while securing for her and her estate the advantage of a stepped-up basis in the AFLAC stock at her death.

40.     While BB&T provided its employees with sales presentations and materials[2] concerning alternative investments like VPFCs, those trainings were woefully inadequate and failed to educate BB&T employees about the speculative and risky nature of VPFCs, their enormous associated fees and costs, and the need to conduct careful analyses before recommending or selling any such product or strategy as prudent or suitable for their clients. Consequently, BB&T employees advising Mrs. Bowers were untrained, misinformed, and lacked expertise on the embedded costs and the inherent risks associated with VPFCs and strategies based on this product.

41.     Unbeknownst to Mrs. Bowers, BB&T purported to subject its sales team to restrictions from providing advice to clients about alternative investments.  However, as a part of

---

[2] BB&T's sales presentations to their own employees used materials developed by individuals who were sometimes employed by BB&T affiliated entities and sometimes employed by Defendants' themselves.

their Alternative Investment Initiative scheme, BB&T simultaneously directed those same representatives to sell VPFCs to Mrs. Bowers and others and provided the representatives with financial incentives to make such sales, in total disregard of their fiduciary duties and in furtherance of the scheme to defraud and deceive trusting clients.

42.     Defendants did not explain the speculative and risky nature of the VPFC or the enormous associated fees and costs.   Specifically, when the strategy was proposed, BB&T, in violation of their fiduciary, common law, statutory and contractual obligations, failed to provide Mrs. Bowers with any of the following:   a complete and understandable description of the embedded and upfront costs and fees associated with VPFCs; a complete and understandable description of the investment risks involved in the transaction and proposed strategy; or any viable, well researched, tried and true, and historically proven options or alternatives.

43.     BB&T did not disclose, explain, or otherwise provide complete and accurate explanations of the negative implications of Mrs. Bowers' participation in a VPFC and the associated strategy, including, but not limited to:

     A.     The riskiness of the VPFCs;

     B.     The imprudence and unsuitability of VPFCs for a person in Mrs. Bowers' position and station in life;

     C.     That VPFCs and the associated strategy increased risk, rather than reducing it;

     D.     The full costs and fees associated with the VPFC, embedded or otherwise; and

E.     That the VPFC strategy trapped Mrs. Bowers into a never-ending series of roll-overs throughout her lifetime such that the costs to Mrs. Bowers would eventually decimate her irreplaceable assets.

44.     In reliance upon the advice provided by BB&T and at their direction, Mrs. Bowers executed a three year VPFC ("VPFC No. 1") covering 210,000 shares of AFLAC stock.

45.     In furtherance of the wealth management scheme designed by BB&T, BB&T Bank first applied the proceeds of VPFC No.1 to satisfy Mrs. Bowers' outstanding obligations, paying off debt owed to another financial institution and thereby simultaneously securing the transfer of her financial assets to the control of BB&T.  The remaining proceeds from VPFC No. 1 were entrusted to BB&T for management ("Investment Account").

46.     BB&T Bank represented that the purpose of the VPFC was to raise cash from which to create a diversified portfolio for Mrs. Bowers and to protect her irreplaceable assets from loss.  Notwithstanding these representations, BB&T knew that their recommended strategy was imprudent, unsuitable and risky and placed Mrs. Bowers' life savings in serious jeopardy of destruction.

47.     BB&T had complete discretion in and totally controlled the Investment Account, the trading activity in that Account, and any purported investment strategy.  Believing that BB&T was acting as her fiduciary and protecting Mrs. Bowers' interests, BB&T's advice was followed and not questioned nor was there reason to question that advice, which, unbeknownst to Mrs. Bowers, was imprudent, aggressive, uninformed, reckless, and in breach of the contractual, fiduciary, common law, and statutory obligations BB&T owed to Mrs. Bowers.

48.     Mrs. Bowers did not receive the diversified portfolio promised by BB&T when they sold her the VPFC, but was instead doubly exposed to market risk, which was imprudent

and unsuitable and inappropriate for an investor of her age and inexperience and with her need for a reliable source of income.

49.    Although BB&T recommended the VPFC purportedly as part of a comprehensive and holistic wealth management plan, her fiduciaries did not explain and Mrs. Bowers did not understand the operation and/or limitations of the VPFC.  BB&T knew, although it did not advise Mrs. Bowers of this, that the investment strategy locked her into a continuing, endless, expensive, and damaging cycle of roll-overs requiring payment of more and more costs and fees despite further depletion of the amount available for investment by the substantial costs of the initial investment and subsequent roll-overs.  BB&T's reckless, imprudent, and incompetent advice and actions placed Mrs. Bowers into a financial death spiral; however, because BB&T failed to explain the operation of the VPFC and its inherent risks and enormous costs, Mrs. Bowers was completely unaware that her meaningful options as well as her financial well-being had been sabotaged, destroyed and hugely damaged.

50.    Although BB&T promised to provide Mrs. Bowers with a comprehensive and holistic wealth management plan designed to achieve her goal of safeguarding her irreplaceable assets, Defendants failed to provide the promised financial and expenditure planning and controls.  As a result of this failure, Mrs. Bowers' assets were not safeguarded, conserved and increased over time as promised, but were instead decimated.  As a further result of Defendants' mismanagement of her financial affairs, Mrs. Bowers could not continue paying insurance premiums for the Bowers Insurance Trust for which BB&T Bank was concurrently acting as trustee.  BB&T Bank then exploited this situation, cross-selling its lending services to loan funds on an annual basis as insurance premiums came due.  The loaned amount including interest, interest on the interest, and bank fees exceeds $1 million and continues to grow.

51.     After the initial sale by BB&T of the VPFC and associated strategy to Mrs. Bowers, BB&T recommended, arranged, and sold to Mrs. Bowers four subsequent VPFC roll-overs, the last being completed in June 2014.  In each rollover as it had advised initially, BB&T Bank recommended, advised, facilitated, sold, and arranged rollover VPFCs as the best option for Mrs. Bowers' financial well-being and the best option to protect her assets and income needs.

52.     Reassured by these promises and representations from BB&T in their role as her trusted fiduciaries whom she believed to be reputable financial advisors with her best interests in mind, Mrs. Bowers followed Defendants' advice to continue the VPFC strategy.

53.     Unbeknownst to Mrs. Bowers, the investment strategy was too risky, imprudent and unsuitable for an elderly and unsophisticated investor like her, but because of her faith, trust and confidence in Defendants, Mrs. Bowers remained unaware that her trust was misplaced and that her assets continued to be exposed to enormous risk, imprudent investment and general mismanagement.

54.     In late 2012, Mrs. Bowers and many other BB&T clients received a letter (a copy of which is attached as Exhibit 2 to this Amended Complaint), which included the following statement:

> Recently, as a part of a review of client accounts we discovered that a fee was charged to your account that we wish to refund to you.  While we are not required to rebate these fees, we choose to do so as a reflection of our corporate values. … This fee would not have been charged under our current billing practices … Thank you for the trust and confidence you have placed in BB&T Wealth.

55.     Unbeknownst to Mrs. Bowers, this statement was incorrect and deliberately designed to be misleading.  The actual impetus for the fee refund was the criticism of BB&T Asset Management's fee practices by the Securities and Exchange Commission ("SEC").  The SEC had criticized BB&T Asset Management's practice of charging transaction-based "broker-

esque" fees for selling derivative products including VPFCs even though that entity lacked a broker-dealer license.  Although BB&T was still serving as Mrs. Bowers' fiduciary, and thus had an absolute obligation of disclosure of material facts to her, upon which she had a right to rely, BB&T deliberately, fraudulently, and deceptively misled Mrs. Bowers and other clients regarding the refund to obscure the nature of their business practices.

56.    Despite their continuing status as Mrs. Bowers' fiduciaries, BB&T has never disclosed to Mrs. Bowers or otherwise acknowledged any of the errors, misrepresentations or unfair and deceptive practices as alleged in this Complaint.  To the contrary, Defendants have at all times maintained and portrayed their advice and recommendations as being an appropriate, prudent and suitable strategy for an elderly person like Mrs. Bowers who lacks financial sophistication or investment experience in derivatives.

57.    As a result of the incompetent, reckless, fraudulent and imprudent "wealth management" provided by BB&T, Mrs. Bowers' assets and income have been decimated, while her faithless fiduciaries have profited at her expense.  Mrs. Bowers placed her faith and trust in BB&T, and their advice and recommended strategy leaves her financially exposed and vulnerable at precisely the time in her life that BB&T promised she would be financially safe and secure.

## DEFENDANTS ARE BOUND BY FINDINGS IN A PRIOR CASE
### (Issue Preclusion/Collateral Estoppel)

58.    Defendants were parties to the case of <u>Francis P. Maybank and Jane H.P. Maybank, as Trustee for the Francis P. Maybank Family Insurance Trust, v. BB&T Corp., Branch Banking and Trust, Successor in merger to Branch Banking and Trust Company of SC, and Sterling Capital Management, LLC, Successor in merger to BB&T Asset Management,</u>

LLC, Civil Action No. 2011-CP-23-8578 in the Court of Common Pleas for the Thirteenth Judicial Circuit, in Greenville County, South Carolina ("Prior Action").

59.     On or about November 10, 2014, an Order and Final Judgment was entered in the Prior Action ("Prior Judgment"), a copy of which is attached as Exhibit 3.  The findings in the Prior Judgment were both actually litigated and necessary to the outcome in the Prior Action and decided against the Defendants which are also parties to this case.  Therefore, the judgment in the Prior Action precludes relitigation of any issue common to this case.

60.     For example, the Prior Judgment included *inter alia* the following findings:

Defendants violated the [South Carolina Unfair Trade Practices] Act by their admitted misuse of their form Wealth Management Agreement ("WMA"). There was evidence that Defendants knew when they presented the WMA to Mr. Maybank that it contained deliberate misrepresentations and that BB&T would not fulfill the promised duties, which were the basis of the bargain and the crux of the fiduciary relationship. **The evidence also showed that Defendants presented the same form document to all clients of the Wealth Management Division from at least 2006 into 2009.** BB&T's corporate representative admitted that Defendants did not notify Mr. Maybank **or any customer** that the WMA would not be fulfilled as promised.

. . . . Defendants [also] misled Mr. Maybank and **approximately 130 other customers** regarding a fee refund. Although BB&T's letter claimed that the fee refund was "a reflection of [BB&T's] corporate values," Ex. 50[3], evidence showed that the fee refund resulted from criticism by the Securities and Exchange Commission ("SEC") of charging transaction-based "broker-esque" fees by BB&T Asset Management, which was not a registered broker-dealer. . . . Defendants' statements unfairly, deliberately, and deceptively hid the truth about BB&T's actions, and was designed to lull clients into complacency, discouraging investigation of BB&T's business practices and allowing BB&T to possibly avoid civil liability.

Exh. 3 at p.4 (footnote and emphasis added).

_____

[3] Exhibit 50 in the Prior Action was a November 29, 2012 letter from Ralph Borello. Except for the name of the client, the account number and the amount of the returned fees, it is identical to the November 2012 letter received by Mrs. Bowers.  *See* Exhibit 2 to this Amended Complaint.

61.     These findings that BB&T's misconduct affected customers in addition to Mr. Maybank were essential to the Prior Action.  This issue (the repetition of Defendants' wrongful acts with other customers including Mrs. Bowers[4]) was therefore both actually litigated and necessary to the outcome in the Prior Action and decided against Defendants which are also parties to this case.  Therefore, the judgment in the Prior Action precludes relitigation of this issue here.

62.     For another example, the Prior Judgment included *inter alia* the following findings:

> Defendants, notwithstanding their position as [plaintiff's] fiduciary, breached their duties in at least one or more of the following ways:
>
> v.  By misrepresenting that BB&T had expertise in VPFCs and the associated strategy;
>
> vi.  By permitting untrained and misinformed representatives to sell a product and strategy which they were unqualified to sell. . . .

Exh. 3 at p.9.

63.     These findings that BB&T misrepresented having expertise in VPFCs and the associated strategy and permitted untrained and misinformed representatives to sell products were essential to the Prior Action.  These issues (the Defendants' misrepresentations about their purported expertise and the untrained nature of its sales force) were therefore both actually litigated and necessary to the outcome in the Prior Action and decided against Defendants which are also parties to this case.  Therefore, the judgment in the Prior Action precludes relitigation of these issues here.

---

[4] Mrs. Bowers' Wealth Management Agreement was admitted into evidence in the Maybank case and she was thus plainly among the "other clients" of BB&T to whom these findings apply.

## FOR A FIRST CAUSE OF ACTION
### Breach of Contract and Covenant of Good Faith and Fair Dealing

64.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this First Cause of Action.

65.    Upon the creation of the investment advisory relationship between Mrs. Bowers and the BB&T Wealth Management/Trust Department, and then as Mrs. Bowers' assets began to be managed by Defendants, BB&T entered into both express agreements and implied agreements with Mrs. Bowers, as formalized in the BB&T Wealth Management Agreement.   These agreements constituted contracts between Mrs. Bowers and BB&T (hereinafter "the Agreements").

66.    As a client of BB&T and also pursuant to the Wealth Management Agreement which formalized the relationship between the parties, BB&T owed Mrs. Bowers the duty to advise her honestly, fairly, competently, and prudently, and in accordance with her needs, goals and best interests.

67.    In addition, Georgia law further implies a covenant of good faith and fair dealing into every contract, including the Wealth Management Agreement and the VPFCs arranged and recommended by BB&T.

68.    Defendants breached their Agreements with Mrs. Bowers in one or more of the following particulars:

        A.    Defendants breached the Agreements by using form contracts which promised to perform duties and provide services which they had no intention or ability to perform or provide;

B.    Defendants repeatedly placed their own interests ahead of Mrs. Bowers'
by creating, recommending, and implementing a risky and flawed wealth
management and investment strategy that was financially lucrative for
Defendants but unsuitable, imprudent, aggressive, uninformed, conflicted,
and reckless for Mrs. Bowers;

C.    Defendants assigned employees to advise Mrs. Bowers who were
untrained,  misinformed, lacked expertise about VPFCs and associated
strategies and were thus unqualified to fulfill their obligations to conduct
analyses to ensure that such complex derivative products were prudent and
suitable;

D.    Defendants  failed to conduct the thorough and individualized analysis of
Mrs. Bowers' financial situation and also failed to prepare the financial
plan for her as promised in the Agreements and instead treated her as a
profit center and cross-selling opportunity for Defendants and their
affiliated companies;

E.    Defendants failed to prepare a financial plan for Mrs. Bowers as promised
and failed to conduct an analysis to determine and advise her about the
prudence and suitability of their recommended strategy to meet her
expenditures and to protect her irreplaceable assets;

F.    Defendants repeatedly advocated and recommended risky derivative
products that not only failed to meet Mrs. Bowers' investment objectives
and income needs but actually increased the risks to her irreplaceable

assets while guaranteeing substantial profits for Defendants and their affiliated companies;

G.     Defendants assured Mrs. Bowers that their wealth management and investment plan would generate sufficient income to meet her income needs, including the payment of insurance premiums in connection with the Bowers Insurance Trust for which BB&T Bank was concurrently serving as trustee, but utterly failed to produce the promised income and further failed to clearly disclose and advise her that the income generated by BB&T's plan was insufficient to meet her needs;

H.     Despite knowing that their plan was risky, imprudent and unsuitable, Defendants nonetheless created and recommended to Mrs. Bowers a wealth management and investment plan based on a series of speculative and costly VPFCs without advising her of their known speculative nature, nor of the substantial risks, costs and fees associated with the on-going plan devised and recommended by Defendants;

I.     Defendants created a multi-level fee structure when they advised Mrs. Bowers to purchase a series of risky derivative products (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at Mrs. Bowers' expense;

J.     As part of their Alternative Investment Initiative, Defendants provided financial incentives to their employees encouraging the sale of VPFCs and associated strategies to generate fees and revenue for BB&T, its affiliated

companies and the employees themselves, thus promoting Defendants' self-interests at Mrs. Bowers' expense in direct violation of their contractual, statutory, common law and fiduciary obligations;

K. Defendants knew, but failed to disclose to Mrs. Bowers, that their continuing "wealth management" strategy would trap her into a financial death spiral of repeated VPFC roll-overs triggering substantial fees which would eventually exhaust the value of her irreplaceable financial assets, leaving her vulnerable, financially insecure and dependent in the final years of her life;

L. Defendants knew of, but failed to disclose to Mrs. Bowers their own financial interests in recommending a series of speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

M. Defendants lacked the expertise concerning wealth management promised in the Agreements and thus failed to ascertain or understand the nature and type of securities promoted to and purchased for Mrs. Bowers and/or misrepresented those securities to her, resulting in substantial losses due to unsuitable and imprudent investments being made on her behalf; and/or

N. Defendants advised Mrs. Bowers to invest her funds in successive VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mrs. Bowers.

69. Defendants' acts and omissions constitute failures to abide by the terms of the Agreements and constitute breaches of the Agreements entered into with Mrs. Bowers as well as

20

breaches of the covenant of good faith and fair dealings.  Mrs. Bowers has been directly and proximately damaged as a result of Defendants' breaches.  In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets.

70.     Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

71.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) attorneys' fees, (4) costs, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

**FOR A SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duty**

72.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Second Cause of Action.

73.     Mrs. Bowers expressly sought the safety and security of fiduciary management for her irreplaceable assets.  Defendants, both individually and collectively, agreed to act as her fiduciaries.  BB&T Bank, who was already serving as trustee over the Bowers Insurance Trust, and BB&T Asset Management undertook to provide fiduciary wealth management and investment advisory services to Mrs. Bowers and also agreed to serve as the personal representative of her estate after her death.  Such relationships are fiduciary under Georgia law and were recognized as such by Defendants in the BB&T Code of Ethics.

74.     Mrs. Bowers' relationship with Defendants involved a relationship of the utmost trust and confidence because of the parties' preexisting relationships, the nature of the transactions in question, and the parties' Agreements, both express and implied.  This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, both

21

individually and collectively, to act with perfect good faith and undivided loyalty in the interests of Mrs. Bowers.

75.     As the fiduciaries of Mrs. Bowers, Defendants owed clear duties to Mrs. Bowers of undivided loyalty, absolute faithfulness, and to exercise due care and diligence with respect to the wealth management and control of Mrs. Bowers' investments, assets and accounts.

76.     The fiduciary relationship assumed and agreed to by BB&T also imposed duties and obligations to keep Mrs. Bowers fully informed of all facts pertinent to any recommended investments (including but not limited to the VPFCs) which BB&T arranged for Mrs. Bowers, to make full disclosure of all facts that could materially affect her financial well-being, to avoid conflicts of interests where BB&T could and did place its interests and its affiliates' interests above Mrs. Bowers' interests, to promptly disclose to Mrs. Bowers any actual or potential conflict of interest, and to exercise reasonable care, diligence, and prudence in the performance of its duties.

77.     At the urging of Defendants, Mrs. Bowers reposed a special confidence in Defendants by entrusting her assets to Defendants, who agreed to accept them and to act as her fiduciaries in providing wealth management and investment advice and related services. Defendants breached their fiduciary duties in one or more of the following particulars:

        A.     Defendants breached the Agreements by using form contracts which promised to perform duties and provide services which they had no intention or ability to perform or provide;

        B.     Defendants repeatedly placed their own interests ahead of Mrs. Bowers' by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was financially lucrative for

Defendants but imprudent, aggressive, uninformed, conflicted, and reckless for Mrs. Bowers;

C.    Defendants assigned employees to advise Mrs. Bowers, who were untrained,  misinformed, lacked expertise about VPFCs and associated strategies and were thus unqualified to conduct analyses to ensure that such complex derivative products were prudent and suitable;

D.    Defendants failed to conduct the thorough and individualized analysis of Mrs. Bowers' financial situation and also failed to prepare the financial plan for her as promised in the Agreements and instead treated her as a profit center and cross-selling opportunity;

E.    Defendants failed to prepare a financial plan for Mrs. Bowers as promised and failed to conduct an analysis to determine and advise her about the prudence and suitability of their recommended strategy to meet her expenditures and to protect her irreplaceable assets;

F.    Defendants repeatedly advocated and recommended risky derivative products that not only failed to meet Mrs. Bowers' investment objectives and income needs, but actually increased the risks to her irreplaceable assets while guaranteeing substantial profits for Defendants and their affiliated companies;

G.    Defendants assured Mrs. Bowers that their wealth management and investment plan would generate sufficient income to meet her income needs, including the payment of insurance premiums in connection with the Bowers Insurance Trust for which BB&T Bank was concurrently

23

serving as trustee, but utterly failed to produce the promised income and further failed to clearly disclose and advise her that the income generated by BB&T's plan was insufficient to meet her needs;

H.      Despite knowing that their plan was risky, imprudent and unsuitable, Defendants nonetheless created and recommended to Mrs. Bowers a wealth management and investment plan based on a series of speculative and costly VPFCs without advising her of the known speculative nature, nor of the substantial risks, costs and fees associated with the on-going plan devised and recommended by Defendants;

I.      Defendants created a multi-level fee structure when they advised Mrs. Bowers to purchase a series of risky derivative products (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at Mrs. Bowers' expense;

J.      As part of their Alternative Investment Initiative, Defendants provided financial incentives to its employees encouraging them to sell VPFCs and associated strategies to generate fees and revenue for BB&T, its affiliated companies and the employees themselves, thus promoting Defendants' self-interests at Mrs. Bowers' expense in direct violation of their contractual, statutory, common law and fiduciary obligations;

K.      Defendants knew, but failed to disclose to Mrs. Bowers, that their continuing "wealth management" strategy would trap her into a financial death spiral of repeated VPFC roll-overs triggering substantial fees which

would eventually exhaust the value of her irreplaceable financial assets, leaving her vulnerable, financially insecure and dependent in the final years of her life;

L.     Defendants knew of, but failed to disclose to Mrs. Bowers, their own financial interests in recommending a series of speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

M.     Defendants lacked the expertise concerning wealth management promised in the Agreements and thus failed to ascertain or understand the nature and type of securities promoted to and purchased for Mrs. Bowers and/or misrepresented those securities to her, resulting in substantial losses due to unsuitable and imprudent investments being made on her behalf;

N.     Defendants advised Mrs. Bowers to invest her funds in successive VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mrs. Bowers; and/or

O.     Defendants misrepresented the facts related to the November 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities. Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

78.     In one or more of the preceding particulars, Defendants acted with imprudence, recklessness, willful misconduct, fraudulent intent, and bad faith and thereby breached the

fiduciary duties owed to Mrs. Bowers, proximately causing her to suffer damages.  In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets.

79.     Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

80.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

**FOR A THIRD CAUSE OF ACTION**
**Breach of Contract Accompanied By Fraudulent Act**

81.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Third Cause of Action.

82.     As a client of BB&T and pursuant to the WMA with the Bank, Mrs. Bowers had Agreements with each Defendant, pursuant to which Defendants owed her a covenant of good faith and fair dealing under Georgia law and a duty to advise her honestly, fairly and in accordance with her needs, goals and best interests and consistent with the promises made in the WMA.

83.     Defendants' fraudulent misconduct, actions and inactions, as alleged in this Complaint, constitute a failure to abide by the terms of Defendants' contracts with Mrs. Bowers, including the WMA, and constitute a breach of the Agreements entered into with her as well as

breaches of the covenant of good faith and fair dealing. Mrs. Bowers has been directly and proximately damaged as a result of Defendants' breaches.

84.     Moreover, in breaching the Agreements with Mrs. Bowers, Defendants exhibited a fraudulent intent relating to those breaches.

85.     Defendants' breaches of the Agreements were accompanied by fraudulent acts and/or omissions on the part of Defendants in one or more of the following particulars:

> A.     Defendants committed fraudulent acts in breach of the Agreements by using form contracts which promised to perform duties and provide services which they had no intention or ability to perform or provide;

> B.     Defendants committed fraudulent acts in breach of the Agreements when they repeatedly allowed  their untrained and misinformed representatives to sell products and strategies which they were unqualified to sell without disclosing that these representatives lacked the wealth management expertise promised by the Agreements;

> C.     Defendants committed fraudulent acts in breach of the Agreements when their strategy based upon the retention of the concentrated position in AFLAC stock and execution of VPFCs failed to protect Mrs. Bowers' assets, income and net worth, despite repeated representations to her that they would provide such protections and then, through the acts and omissions alleged in this Complaint, attempted to disguise the shortcomings of the strategy known to Defendants by repeatedly misrepresenting and/or failing to disclose to Mrs. Bowers accurate and

truthful information related to the costs and risks of the strategy based on the VPFCs;

D.     Defendants committed fraudulent acts in breach of the Agreements by placing their own interests ahead of Mrs. Bowers' interests by creating, recommending, and executing an on-going risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, and reckless, while assuring Mrs. Bowers that the strategy was instead defensive, prudent and suitable for her;

E.     Defendants committed fraudulent acts in breach of the Agreements by repeatedly recommending and selling risky derivative products which guaranteed substantial profits for Defendants and their affiliated companies but failed to meet Mrs. Bowers' investment objectives and income needs, while assuring Mrs. Bowers that these products were defensive, prudent and suitable for her, although they actually increased the risk to her assets;

F.     Defendants committed fraudulent acts in breach of the Agreements by repeatedly recommending and executing wealth management and investment schemes premised upon Mrs. Bowers' holding of an over-concentrated position of AFLAC stock which advanced Defendants' interests, but failed to meet Mrs. Bowers' investment objectives and income needs, while repeatedly assuring Mrs. Bowers that this strategy was defensive, prudent and suitable for her, although they actually increased the risk to her assets;

G.     Defendants committed fraudulent acts in breach of the Agreements by recommending and executing an on-going wealth management and investment plan based on VPFCs known to Defendants to be speculative and costly, while Defendants repeatedly assured Mrs. Bowers that this strategy was defensive, prudent and suitable and simultaneously failed to advise her of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

H.     Defendants committed fraudulent acts in breach of the Agreements by recommending and selling investment products as being prudent and suitable for Mrs. Bowers, when in fact they knew that such investment products were imprudent and not suitable for Mrs. Bowers given her age and position as a retired person lacking in sophistication and investment experience in derivative products and actually increased the risk to her assets;

I.     Defendants committed fraudulent acts in breach of the Agreements by representing to Mrs. Bowers that VPFCs were reasonable and sound vehicles by which Mrs. Bowers could attain her investment goals and meet her income needs, while providing liquid funds to pay off her debts, when they knew or should have known that this strategy was doomed to failure and that this undisclosed information was material to Mrs. Bowers;

J.     Defendants committed fraudulent acts in breach of the Agreements by recommending multiple successive roll-overs of the VPFC, while failing to advise Mrs. Bowers about the enormous early termination and roll-over

fees associated with those transactions, when they knew or should have known that the undisclosed information about fees was material to Mrs. Bowers; and/or

K.  Defendants committed fraudulent acts in breach of the Agreements by misrepresenting the facts related to the November 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.  Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

86.  As a direct, consequent and proximate result of Defendants' breaches of contract accompanied by fraudulent acts, Mrs. Bowers has suffered damage in violation of the laws of the State of Georgia.

87.  Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

88.  Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the fraudulent acts accompanying the breaches of the Agreements, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, (6) and such other relief as is just, equitable, and proper.

## FOR A FOURTH CAUSE OF ACTION
### (STATE SECURITIES ACT VIOLATIONS)

89.  The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fourth Cause of Action.

90.     In the course of their fiduciary duties to Mrs. Bowers, Defendants recommended and advised that she enter into imprudent and unsuitable transactions involving *inter alia*, the VPFCs and the Investment Account, and in so doing, misrepresented the risk of the products and Investment Account to Mrs. Bowers and thereby defrauded her as is set forth in more detail in this Complaint.

91.     The actions, inaction, untrue statements and omissions of Defendants were made (or not disclosed) to Mrs. Bowers in connection with the offer, sale, or purchase of securities, either directly or indirectly, including, but not limited to, the VPFCs and the securities bought and sold in the Investment Account.

92.     The fraud herein alleged to have been committed by Defendants was accomplished by means of untrue statements of material fact or omissions of material facts.

93.     On information and belief Defendants were compensated, either directly or indirectly, for the investment advice and services provided, all of which was accomplished by means of untrue statements and the development and implementation of an investment scheme that rewarded Defendants, but defrauded Mrs. Bowers as alleged herein.

94.     The actions of Defendants were wrongful, fraudulent, and in violation of OCGA § 10-5-58, *et seq.,* and the regulations, rules, and standards regulating broker conduct established thereunder.

95.     As a consequent and proximate result of the fraud perpetrated and the misrepresentations and material omissions made by Defendants, Mrs. Bowers suffered substantial damages.   In addition, the failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets.

96.     Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

97.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) costs, (3) attorneys' fees, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable and proper.

## FOR A FIFTH CAUSE OF ACTION
### Fraudulent Misrepresentation

98.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fifth Cause of Action.

99.     Defendants represented to Mrs. Bowers that they would perform duties and provide services specified in the form Wealth Management Agreement, although they had no intention or ability to act as promised.

100.    Defendants further represented to Mrs. Bowers that the Wealth Management/Trust Department of the Bank was highly trained, thoroughly knowledgeable, and dedicated to championing client interests, and that BB&T specialized in working with clients to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of that particular client.

101.    Defendants further represented to Mrs. Bowers that they had special expertise in VPFCs and that the investment strategy devised and recommended by Defendants, including the imprudent and unsuitable VPFC and subsequent investment scheme, as it continued through each subsequent rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth,

help her achieve important diversification goals, and meet all of her income needs including fully funding insurance premiums of the Bowers Insurance Trust for which BB&T Bank was concurrently serving as Trustee.

102.    Given Mrs. Bowers' investment profile, including her age, retirement goals and tolerance to risk, as well as her lack of investment knowledge and experience, Defendants' representations were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

103.    Defendants knew that each representation made to Mrs. Bowers regarding the investment strategy they devised were false, and in recommending the strategy and its continued use to Mrs. Bowers, they exhibited a reckless disregard for the truth and/or falsity of their representations.

104.    Defendants further misrepresented the facts related to the November 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

105.    Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

106.    Mrs. Bowers relied upon the representations made to her by the Defendants, all of whom were acting as her fiduciary.

107.    Defendants intended for Mrs. Bowers to act upon their advice and representations, which was given in the course of the fiduciary relationship existing between Defendants and Mrs. Bowers.

108.   Mrs. Bowers did not realize or understand the falsity of Defendants' representations.

109.   Mrs. Bowers had a right to rely upon the representations made to her by Defendants, her fiduciaries.

110.   Defendants' representations were false, ill-conceived and imprudent, reckless, willful, fraudulent, and made in bad faith.  In the absence of these representations, upon which Mrs. Bowers relied and continued to rely through each subsequent rollover up to and including the most recent transaction in July 2014, she would not have entrusted and continued to entrust her assets to Defendants for management.  These representations were the proximate cause of the damages suffered by Mrs. Bowers, including but not limited to the decimation of Mrs. Bowers' assets and income by the failed investment "strategy" recommended and implemented by Defendants.

111.   Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

112.   Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

### FOR A SIXTH CAUSE OF ACTION
**Constructive Fraud**

113.   The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Sixth Cause of Action.

114.    Defendants represented to Mrs. Bowers that they would perform duties and provide services specified in the form Wealth Management Agreement, although they had no intention or ability to act as promised, and that the employees assigned to advise Mrs. Bowers were highly trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and specialized in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.

115.    Defendants further represented to Mrs. Bowers that they had special expertise concerning alternative investment strategies, like VPFCs, and that the investment strategy devised and recommended by Defendants, including the imprudent and unsuitable VPFC and subsequent investment scheme as it continued through each subsequent rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, help her achieve important diversification goals, and meet all of her income needs including fully funding insurance premiums of the Bowers Insurance Trust for which BB&T Bank was concurrently serving as Trustee.

116.    Given Mrs. Bowers' investment profile, including her age, retired status, income needs and tolerance to risk, as well as her lack of investment knowledge and experience, Defendants' representations were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

117.    In their capacity as Mrs. Bowers' fiduciaries, which capacity they had solicited and for which they were compensated, Defendants should have known the falsity of the representations they made to Mrs. Bowers with respect to the imprudent and unsuitable

investment strategy, and in recommending the strategy to Mrs. Bowers, Defendants exhibited a reckless disregard for the truth and/or falsity of their representations.

118.    Defendants further misrepresented the facts related to the November 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

119.    In their capacity as Mrs. Bowers' fiduciaries, which capacity they had solicited and for which they were compensated, Defendants should have known the falsity of the representations they made to Mrs. Bowers with respect to the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

120.    The false representations made by Defendants were material to Mrs. Bowers' decision to entrust her investment assets to the management and fiduciary care of Defendants and to continue that relationship of fiduciary trust; and Defendants intended Mrs. Bowers to act upon those false representations.

121.    Mrs. Bowers was completely unaware of the falsity of the representations made to her by Defendants, including the imprudence of the investment strategy devised by Defendants and their agents and employees and Defendants' misconduct in providing their services.

122.    Mrs. Bowers had a right to rely upon the representations made to her by Defendants and did, in fact, rely upon those representations.

123.    Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mrs. Bowers' reliance upon Defendants' representations were the proximate cause of the damages that she has suffered.  In addition, the

failed investment "strategy" recommended and implemented by Defendants decimated Mrs. Bowers' assets and income.

124.    Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

125.    Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A SEVENTH CAUSE OF ACTION
### Fraud in the Inducement

126.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Seventh Cause of Action.

127.    Defendants fraudulently misrepresented to Mrs. Bowers that they would perform duties and provide services specified in the form Wealth Management Agreement, although they had no intention or ability to act as promised, and that the employees assigned to advise Mrs. Bowers were well trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and specialized in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.

128.    Defendants further represented to Mrs. Bowers that they had expertise concerning alternative investment strategies, like VPFCs and that the investment strategy devised

and recommended by them, including the imprudent and unsuitable VPFC and subsequent investment scheme, as it continued through each subsequent rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, help her achieve important diversification goals, and meet all of her income needs, including fully funding insurance premiums of the Bowers Insurance Trust for which BB&T Bank was concurrently serving as Trustee.

129.   Defendants' misrepresentations to Mrs. Bowers were intended to deceive her and to encourage her to entrust her investment assets to Defendants for investment in an ill-conceived, risky, flawed, and completely imprudent and unsuitable strategy, which put Mrs. Bowers' assets in fee-generating accounts under Defendants' exclusive control.

130.   Given Mrs. Bowers' investment profile, including her age, retirement goals and tolerance to risk, as well as her lack of investment knowledge and experience, Defendants' representations were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

131.   Defendants knew that each representation made to Mrs. Bowers regarding the investment strategy they devised were false, and in recommending the strategy and its continued use to Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

132.   Defendants further misrepresented the facts related to the November 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

133.   Defendants knew that the representations made to Mrs. Bowers regarding the fee refund were false, and in concealing their misconduct from Mrs. Bowers, they exhibited a reckless and/or deliberate disregard for the truth.

134.     Mrs. Bowers had a right to rely upon the representations made to her by her fiduciaries, and she did so rely to her great detriment.

135.     Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mrs. Bowers' reliance upon Defendants' representations were the proximate cause of the damages that she has suffered. In addition, Defendants' false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith representations decimated Mrs. Bowers' assets and income.

136.     Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

137.     Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR AN EIGHTH CAUSE OF ACTION
### Negligent Misrepresentation

138.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Eighth Cause of Action.

139.     The misrepresentations made by Defendants as described in this Complaint were made negligently, grossly negligently, willfully and/or recklessly.

140.     Defendants misrepresented to Mrs. Bowers that they would perform duties and provide services specified in the form Wealth Management Agreement, although they had no intention or ability to act as promised, and that the employees assigned to advise Mrs. Bowers

were highly trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and specialized in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.

141.    Defendants further represented to Mrs. Bowers that they had expertise concerning alternative investment strategies, like VPFCs, and that the investment strategy devised and recommended by them, including the imprudent and unsuitable VPFC and aggressive investment scheme, as it continued through each rollover, would allow Mrs. Bowers to reduce the risk of her concentrated position, protect her from losses in the overall value of her investment portfolio and resulting net worth, help her achieve important diversification goals, and meet all of her income needs including fully funding insurance premiums of the Bowers Insurance Trust for which BB&T Bank was concurrently serving as Trustee.

142.    The above-referenced representations were false, as the strategies employed by Defendants did not achieve the goals promised to Mrs. Bowers.

143.    Defendants further misrepresented the facts related to the November 2012 fee refund, hiding from Mrs. Bowers the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities.

144.    In their capacity as Mrs. Bowers' fiduciaries, which capacity they had solicited and for which they were compensated, Defendants should have known the falsity of the representations they made to Mrs. Bowers with respect to the fee refund, and in concealing their misconduct from Mrs. Bowers, they exhibited a negligent and reckless disregard for the truth.

145.    Defendants had a pecuniary interest in advocating for an investment strategy that would place Mrs. Bowers' assets into fee generating accounts under the sole control of Defendants.

146.    Mrs. Bowers' relationship with Defendants involved a relationship of the utmost trust and confidence.  Defendants had agreed to act as Mrs. Bowers fiduciaries, thus requiring them to act with perfect good faith and undivided loyalty in the interests of Mrs. Bowers.

147.    Defendants breached their fiduciary duties and made misrepresentations to Mrs. Bowers in one or more of the particulars described in this Complaint.

148.    Mrs. Bowers had a right to rely upon the representations made to her by Defendants who were her fiduciaries, and she did rely to her great detriment.

149.    Defendants' representations were false, ill-conceived and imprudent, negligent, reckless, willful, and made in bad faith, and Mrs. Bowers' reliance upon Defendants' representations were the proximate cause of the damages that she has suffered.

150.    Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

151.    Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the negligence, gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A NINTH CAUSE OF ACTION
### Civil Conspiracy

152.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Ninth Cause of Action.

153.    Defendants BB&T Bank and BB&T Asset Management, through their respective employees, agents, servants, and representatives, including their respective corporate predecessors in interest, corporate parent, BB&T Corporation, and other affiliated companies, conspired with each other to breach their agreements with and/or legal duties and obligations to Mrs. Bowers.

154.    Defendants acted in concert in a deceitful and fraudulent manner, conspiring to engage in conduct to harm Mrs. Bowers, as described in each of the causes of action above. Defendants actions included, but are not limited to:

        A.    Conspiring to breach the WMA with Mrs. Bowers, by having no intention of fulfilling, and then failing to fulfill their duties and obligations set forth in the WMA;

        B.    Conspiring to breach the fiduciary duties owed to Mrs. Bowers;

        C.    Conspiring to breach the WMA with Mrs. Bowers with fraudulent intent and through fraudulent acts, misrepresentations, and deliberate omissions;

        D.    Conspiring to violate the State Securities Act by, *inter alia*, failing to conduct the required suitability analysis, making material misrepresentations and omissions in the recommendation and sale of securities including but not limited to the VPFCs, and charging and

receiving transaction-based fees for brokerage type services for which they were not properly registered;

E.  Conspiring to misrepresent facts regarding the investment strategy recommended and sold to Mrs. Bowers upon which she was entitled to, and did, in fact, rely;

F.  Conspiring to misrepresent facts and deceive Mrs. Bowers regarding BB&T's expertise, their knowledge, or lack thereof, of the investment strategy recommended and sold to Mrs. Bowers, their failure to perform a suitability analysis for Mrs. Bowers, and their failure to develop a prudent financial plan for Mrs. Bowers;

G.  Conspiring to deceive Mrs. Bowers by misrepresenting the facts related to the fee refund in November 2012 and hiding from her the existence of claims for BB&T's concealed misconduct and lack of proper registration for their activities; and

H.  Conspiring to induce Mrs. Bowers to accept Defendants' fee-driven strategy through misrepresentation of the facts and risk surrounding the investment strategy recommended and sold to Mrs. Bowers.

155.  Defendants agreed to and did, in fact, conspire with one another to breach their agreements with and/or legal duties and obligations to Mrs. Bowers, and Defendants' conspiracy proximately caused damage to Mrs. Bowers.

156.  Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

157.    Mrs. Bowers is therefore informed and believes that she is entitled to (1) actual damages, (2) consequential damages, (3) special and/or punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, (6) attorney's fees, and (7) such other relief as is just, equitable and proper.

## FOR A TENTH CAUSE OF ACTION
### Georgia Racketeer Influenced and Corrupt Organizations Act

158.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Tenth Cause of Action.

159.    Defendants' actions as described in this Complaint constitute violations of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, O.C.G.A. §§ 16-14-1 *et seq.*

160.    Defendants engaged in at least two acts of racketeering activity in furtherance of one or more incidents, the Alternative Investment Initiative scheme, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, as set forth in O.C.G.A. §§ 16-14-3 (8)(A), (9)(A).

161.    Defendants' predicate acts committed in furtherance of their pattern of racketeering activity in violation of O.C.G.A. §§ 16-14-4 include, but are not limited to:

A.      Obtaining control over Mrs. Bowers' irreplaceable assets by means of a deceitful and/or artful practice with the intention of profiting from same at the expense of Mrs. Bowers (O.C.G.A. 16-14-3(9)(A)(ix));

44

B.   Knowingly and intentionally recommending and advising Mrs. Bowers to enter imprudent and unsuitable transactions and investments, misrepresenting the risk of these products and investments, failing to be properly registered to transact the recommended transactions, employing untrue statements and/or omissions in connection with the offer, sale, or purchase of securities, and receipt of compensation for all of the above (O.C.G.A. 16-14-3(9)(A)(xxi));

C.   Knowingly and intentionally engaging in a scheme or artifice to defraud Mrs. Bowers of her irreplaceable assets through the use of and furtherance by interstate wire communications (O.C.G.A. 16-14-3(9)(A)(xxix)); and

D.   Perpetrating a fraud in the sale of securities to Mrs. Bowers (O.C.G.A. 16-14-3(9)(A)(xxix));

162.   Defendants' pattern of racketeering activity was motivated by a pecuniary interest in Mrs. Bowers' irreplaceable assets in which Defendants acquired and maintained, both directly and indirectly, an interest and control.  Defendants' pattern of racketeering activity was willful, intentional, and knowing.

163.   Mrs. Bowers has suffered damages as a result of the aforementioned pattern of racketeering activity and practices employed by Defendants.

164.   Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

165.   Mrs. Bowers is therefore informed and believes that she is entitled to a judgment against Defendants for actual and consequential damages, treble damages, punitive damages,

attorneys' fees, and costs of investigation and litigation pursuant to the Georgia RICO Act, and such other further relief as the Court deems just and proper.

## FOR AN ELEVENTH CAUSE OF ACTION
### Georgia Fair Business Practices Act

166.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Eleventh Cause of Action.

167.    Defendants engaged in unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce as is set forth in this Complaint.  Defendants' unfair acts and business practices included, but are not limited to, presenting Mrs. Bowers with a form Wealth Management Agreement which BB&T knew contained deliberate misrepresentations and promises which BB&T knew it would not fulfill, even though the promised duties were the basis of the bargain and the crux of the fiduciary relationship with Mrs. Bowers.  BB&T also misled Mrs. Bowers regarding the motivation behind the fee refund, thus unfairly, deliberately, and deceptively hiding the truth about BB&T's actions in an attempt to discourage investigation of BB&T's business practices and thereby shield Defendants and BB&T Corporation from civil liability through the passage of time.

168.    As a result of BB&T's unfair acts and business practices, Mrs. Bowers was induced to enter into wealth management relationships and subsequently to trustingly rely upon wealth management advice, investments, strategies, loans for insurance premiums, and related services which resulted in extensive damages to the assets and income sources and streams which BB&T had agreed to manage, safeguard, preserve and increase over time.

169.    Such unfair acts and practices, including, but not limited to those described above, constitute a violation of the Georgia Fair Business Practices Act, S.C. Code Ann. § § 10-1-390 *et seq.*

170.    Defendants' unfair acts and practices constituted willful, intentional, and knowing violations of the Fair Business Practices Act.

171.    Defendants are bound by and cannot relitigate here any relevant adverse findings in the Prior Action that relate to this Cause of Action.

172.    Mrs. Bowers has suffered damages as a result of the aforementioned unfair and deceptive acts and practices of Defendant, including but not limited to losses of the value of the assets, the enormous costs associated with the VPPF strategy, losses from the failure to provide prudently managed strategies designed to provide market-based returns while safeguarding Mrs. Bowers' irreplaceable assets, damages associated with loans made to pay insurance premiums, and losses from the failure to provide promised financial and expenditure planning and controls.

173.    Pursuant to OCGA § 10-1-399(b), Plaintiffs served Defendants with a written demand for relief before filing this cause of action seeking relief under the Fair Business Practices Act.  More than thirty days have elapsed since the service of that demand.  No written tender of settlement has been made by Defendants.

174.    Mrs. Bowers is therefore informed and believes that she is entitled to a judgment against Defendants for actual and consequential damages, treble damages and attorneys' fees pursuant to the Fair Business Practices Act, costs, and such other further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** having set forth her claims, Plaintiff asks that her claims be tried by jury and prays for judgment against Defendants as follows:

a.    For actual damages;

b.    For consequential damages;

c.    For treble damages;

d.    For punitive damages in an amount to be determined by the finder of fact;

e.    For prejudgment interest at the highest legal rate;

f.    For the costs of this action;

g.    For reasonable attorneys' fees and costs of investigation and litigation; and

h.    For such other and further relief as is just, equitable, and proper.

Respectfully submitted,

Gregory S. Ellington, Georgia Bar No. 246863
**HATCHER, STUBBS, LAND, HOLLIS &
ROTHSCHILD, LLP**
P.O. Box 2707
Columbus, Georgia  31902-2707
(706) 324-0201

  /s/ Chad Johnston
Mitchell Willoughby, Fed. Bar No. 4702
Elizabeth Zeck, Fed Bar No. 6627
Chad Johnston, Fed. Bar No. 10813
**WILLOUGHBY & HOEFER, P.A**.
930 Richland Street
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
(Admitted to Practice *Pro Hac Vice*)

Attorneys for Effie Campbell Siegling Bowers by and through her Attorney-in-fact Terrell W. Bowers.

April 23, 2015
Columbus, Georgia

48